**UNITED CENTRIFUGAL PUMPS, a California Corporation, a Plaintiff,**

**v.**

**Andrew D. CUSIMANO and Danny W. Humes, Defendants.**

No. 87–3074.

United States District Court, W.D. Arkansas, Fayetteville, Division.

Feb. 18, 1988.

Van T. Younes, Covington & Younes, Harrison, Ark., Ernest M. Anderson, Eckhoff, Hoppe, Slick, Mitchell & Anderson, San Francisco, Cal., for plaintiff.

Thomas D. Ledbetter, Ledbetter & Associates, Harrison, Ark., P. Terence Crebs, Caruthers, Herzog, Crebs & McGhee, St. Louis, Mo., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff, United Centrifugal Pumps (UCP), is a California corporation with its principal place of business in California, and defendants are citizens and residents of Harrison, Boone County, Arkansas. The court has jurisdiction because of diversity of citizenship and the requisite jurisdictional amount being in dispute.

UCP is engaged in the business of manufacturing and selling pumps and components and has a facility in Harrison, Arkansas. The Harrison plant is primarily engaged in the manufacture of internal components for pumps and for the replacement of worn parts in the after-market. Many of the pump components made at the Harrison facility are of the type which are subject to wear and must be repaired or replaced. The surfaces which are subject to wear and use are often hardfaced, which is accomplished by either heat treating or applying an overlay of exotic materials using a plasma transfer arc (PTA) torch.

The defendants, until they voluntarily terminated their employment at the end of April, 1987, were trusted employees of UCP. Defendant Cusimano was originally employed by UCP in July, 1968. He was first employed by plaintiff's California general office, first as a machinist in the machine shop, and later as a computer programmer trainee and computer programming supervisor. He later became the project supervisor in the manufacturing department. In March of 1979, he accepted relocation to the Harrison facility where he became plant manager. He held that position until he and Humes voluntarily terminated their employment in a dispute with management. Cusimano terminated his employment on April 29, 1987.

The evidence shows that Cusimano is an accomplished computer programmer, particularly adept at programming computer controls for use in automated welding operations. He was instrumental in the design and programming of the UCP system described below.

Defendant Humes began his employment at the Harrison facility in August of 1980 and terminated his employment on April 29, 1987. He was employed initially as a machine operator, then general foreman and maintenance supervisor. He was, during the entire period of his employment, an hourly employee.

Prior to becoming employed at UCP, Humes had had a great deal of experience and training as a welder, and the evidence shows that he was a master craftsman with a great deal of knowledge in respect to all types of welding. According to his testimony, he was trained as a welder by his grandfather at age fourteen, and at that early age he had his own shop in which he repaired motorcycles and the like.

Humes attended three semesters at the University of Arkansas School of Engineering, but later dropped out. His interest in welding continued to the date of the hearing in this case. He testified that he had, for a long period, made almost monthly trips to the University of Arkansas engineering library at Fayetteville to study and become familiar with new technology in the

welding industry. A large number of exhibits were introduced at the hearing, many of which had been obtained by Humes during these trips to the library, and in other ways. Based on the evidence in this case, the court has little doubt that Humes is a master craftsman, with an exceptional knowledge about welding· and welding techniques, particularly technically advanced welding techniques such as PTA welding.

Prior to this employment at UCP, he had studied and worked with PTA welding torches. While employed there, he was engaged in updating and building PTA torches for the pump operation, and, in effect, took over its PTA welding operation. During that time, he continued to study PTA torch technology. Some of his study, such as the library visits, was on his own time, and some was done on company time for which he was compensated on an hourly basis.

Beginning in 1984, Humes began to build PTA torches for the hardsurfacing operation at the pump plant. The torch that he developed was less expensive to build and shortened down time experienced when UCP used conventional torches then on the market.

The torches that he built were assembled from a combination of components which were then available in the market, and parts which he built or machined, such as nozzles. While the PTA torches built by him were smaller and used lower amperage power sources than customary, they appeared to function in the same manner as torches of this type which had been on the market for many years.

After an aborted attempt to sell this technology to others, beginning in early 1985, UCP discovered that these torches built by Humes were capable of welding exotic materials onto very thin surfaces. In addition, Humes and Cusimano, with Cusimano doing the programming, developed a computer controlled device to aid in controlling the PTA torch when used to weld thin parts.

UCP, primarily through Cusimano and Thomas Lambert, executive vice president of manufacturing, with offices in California, set out to utilize this welding technology by selling plaintiff's services to manufacturers and rebuilders of gas turbine engines such as those used in jet aircraft. It appears from the record made in this case that UCP has been successful in accomplishing that. While, according to the evidence, the income from these services has not yet been great, it appears that UCP has sold its services on a number of occasions to manufacturers and rebuilders of gas turbine engines and has rebuilt a number of parts using the PTA welding technology described above. In order to do this, Lambert, and before his departure, Cusimano, called on a number of individuals in the gas turbine engine industry, but the evidence indicates that that industry is composed of very few entities. No one at the hearing in this matter could name more than five or six.

The repair of gas turbine components used in the aircraft industry requires approval of the Federal Aviation Administration (FAA). When UCP became interested in providing these services, they set out to gain FAA approval of their facilities. The day before the FAA examiner was to inspect the Harrison facilities, Cusimano and Humes quit in a dispute with management, apparently over remuneration for their services. FAA approval was received, and UCP is now engaged in the business of repairing engines, using the PTA welding technology.

Shortly after Cusimano and Humes left the employment of plaintiff, they formed their own corporation known as Ceram-Weld, and Humes set out to build a PTA torch. At the hearing in this case, both Cusimano and Humes testified that the torch that Humes built in that endeavor was substantially different than the torch developed at UCP. According to that testimony, one substantial difference is that the PTA torches used at UCP were designed to and were capable of welding only metals to the surfaces to be repaired. Humes says that the torch that he built is designed to mix ceramic granules into the weld material, providing a surface that should provide

even longer wear than the exotic materials previously used. He very earnestly testified that the torch that he built varies substantially from that used at UCP, and that it is the result of his long study, training, and knowledge in PTA welding. He says that he used components which are available on the market and machined the nozzles himself. At the hearing, his torch was displayed, and it does appear to the court that the nozzle operation, and at least its configuration, is different than that of the UCP torch. Both Humes and Cusimano testified that the torch they have developed is not computer driven but, instead, must be manually operated.

They agreed that they were attempting to sell the ceramic welding technique to the gas turbine engine industry but, although they had made some test welds for that industry, they had not sold their services to any entity. They say that every test weld made utilized the ceramic-metal mixture with the exception of one which Humes made with an especially exotic metal at the request of a manufacturer who advised that it was impossible to weld with that material without getting "microcracks" in the welded material. He says that he was able to weld with the material without those cracks appearing.

Humes earnestly testified that he did not utilize trade secrets developed during his employment at UCP. Instead, his endeavors since his termination are the result of his exceptional training, experience and study acquired over a virtual lifetime, starting at age 14 (he is now 36). UCP seeks to prevent him from, among other things, using or disclosing to others "the use of plasma transfer arc technology which involves the use of a torch at an amperage less than twenty amps to repair or hardsurface knife seals or edge surfaces less than three-sixteenths ($\frac{3}{16}$) inch thickness." Humes contends that any experienced welder knows that it is necessary to decrease amperage when welding thin material. He says, in effect, that that is not a trade secret—only common sense.

On November 10, 1987, plaintiff filed suit against Cusimano and Humes and on Janu-ary 25, 1988, it filed the necessary pleadings to seek a preliminary injunction. It requests that the court enjoin defendants from "soliciting or engaging in the repair of jet engine components from a customer or potential customers of United Centrifugal Pumps; and from using or disclosing to others any information learned during their employment with United Centrifugal Pumps relating to the use of plasma transfer arc technology which involves the use of a torch at an amperage less than twenty amps to repair or hardsurface knife seals or edge surfaces less than three-sixteenths ($\frac{3}{16}$) inch thickness." A motion for preliminary injunction was supported by the affidavit of Earnest M. Anderson, plaintiff's counsel, introducing a number of exhibits, including a portion of the transcript of the depositions of Cusimano and Humes, and an affidavit of Thomas Lambert swearing to many of the facts set forth above.

When defendants' counsel moved for an extension of time in which to respond to the motion for preliminary injunction, the court, at the request of plaintiff's counsel, set the matter for hearing. Oral and documentary evidence was received by the court on Friday, February 12, and Saturday, February 13. At this hearing plaintiff elected to stand primarily on the affidavits and other documentary evidence supplied at the time the motion was made, but called the present plant manager who knew little about the development of the technology. His testimony primarily was concerned with establishing that the technology was of value to UCP.

Defendants each testified in person, and it was obvious at the close of the hearing, particularly after the court considered the testimony of Humes, that there is a serious dispute about the facts in this matter, particularly as they relate to the construction and use of the UCP torch when compared with that of the one that Humes developed after he left its employment. Frankly, before Humes testified, the court believed that defendants had attempted to appropriate for their own use UCP's trade secrets. However, after that testimony, the court is not at all sure that that is the case. Instead, it appears that there is a substantial

argument that Humes' present device does not infringe on any right that UCP has. The court simply does not know because, in the court's view, it is impossible to tell from the evidence adduced at the hearing.

The law in this circuit is well settled in respect to the tests to be used in determining whether a preliminary injunction should be granted. However, it is much more difficult to apply these tests. In *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc), the court held that this extraordinary remedy should not be granted unless the movant demonstrates:

1) that it is threatened with irreparable harm;

2) that this harm outweighs any injury which granting the injunction will inflict on other parties;

3) that the movant will probably succeed on the merits; and

4) that the public interest favors an injunction.

While, at first blush at least, that seems to be relatively simple, the cases indicate that application has not been so simple. In fact, the court in *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500 (8th Cir.1987) said:

The focus in determining probable success should not be to apply the probability language with mathematical precision. Rather, a court should flexibly weigh the case's particular circumstances to determine "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."

In other words, what the court seems to say is that the four factors set forth above are to be considered but the court is to apply them on some sliding scale to "do right."

*Calvin Klein, supra,* also stands for the proposition that the burden on a movant to demonstrate that a preliminary injunction is warranted is heavier when granting the preliminary injunction will, in effect, give the movant substantially the relief it would obtain after a trial on the merits.

As is pointed in 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2948 at p. 428: "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (Citing Cases)

As pointed out above, substantially all of plaintiff's "written" evidence in this case is controverted by the in person testimony of each of the defendants. The court did not have the benefit of the testimony of an expert comparing the technology utilized in Humes' latest torch with that of the UCP torch. As indicated, there is a substantial dispute about that, and the court simply does not know who is right. It has been said that "... a motion for a preliminary injunction supported only by written evidence usually will be denied when the facts are in dispute." 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2949 at p. 475.

With the "law" set forth above in mind, the court will attempt to apply that law to the record available. As required by Dataphase, *supra,* the court must determine whether it believes that the plaintiff has a substantial probability of success on the merits. It is recognized that that case and others following it do not require that the court determine with certainty that the movant has a better than fifty percent chance of succeeding before it will grant an injunction, especially where other factors weigh heavily in favor of one, but it appears that there must be at least a substantial chance of winning. If the court does not believe that there is, or if it simply cannot tell, one way or the other, the motion should probably be denied. In this respect, it should be remembered that a preliminary injunction is an extraordinary measure and should be carefully considered, especially in a case such as this one in which the injunction will not only give plaintiff the relief that it will have if it wins on the merits, but may prevent defendants, and particularly defendant Humes, from plying a craft at which he is particu-

larly adept, thus preventing him from earning a living.

Ark.Code Ann. § 4–75–601 defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process" which "derives independent economic value, actual or potential, from not being generally known to, or not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."

There are two facets to the request made by plaintiff in this case. Plaintiff first asks that the court preclude defendants from calling on persons in the gas turbine engine industry because the identity of those persons was learned while they were employed at UCP and, thus, these customer lists, are trade secrets. In this respect, the court simply cannot find that the plaintiff has carried its burden of proving, with sufficient clarity, that these customer lists are not readily ascertainable by proper means. Other than the affidavit of Lambert, the only evidence that the court has in this respect came from the mouths of Cusimano and Humes to the effect that there are only a few entities in this business, and that one can determine the names of the individuals to call simply by going to readily available sources. That evidence was not controverted by the plaintiff, either orally or by written document, so the court cannot say that the plaintiff has carried its burden of showing that the customer lists are trade secrets, at least not with sufficient certainty to warrant the court imposing the severe remedy of ordering the defendants not to call on any of them, for any purpose connected with their business, even to sell the claimed new technology developed by Humes after termination of his employment, technology which he claims is totally different from that developed at UCP.

That issue, to some degree at least, merges into the issue of whether the plaintiff has carried its burden of showing that, in the first place, it has a trade secret, and, even if it does, that defendants are misappropriating it.

As indicated, the court simply does not know, based on the record before it, whether plaintiff has a protectible trade secret, and it is even less clear whether, if it does, defendants' technology infringes it. The court simply needs to know more about Humes' claimed new PTA torch before it can determine with the certainty necessary, that it infringes. It should be remembered that defendants in this case do not have the burden of establishing anything in this respect. As indicated above, that burden is upon the plaintiffs and, in a case such as this one, is a heavy one.

In the words of the court in *Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey*, 149 F.Supp. 460, 463 (D.N.J.1957):

> This case illustrates the futility of considering a motion for preliminary injunction in cases of this kind upon *ex parte* affidavits. Not only is there a conflict of material facts, but there are serious and intricate questions of law involved.... It has been said that in weighing an application for preliminary injunction, to doubt is to deny.

As an example of the intricate and difficult questions of law in this case, one needs only to consider what the rights of the employee-inventor are vis-a-vis his employer. See *Callman Unfair Competition, Trademarks & Monopolies* § 14.27 (4th Ed.1984). In this respect, the court learned, almost in passing, at the very close of the hearing, that Humes was paid on an hourly basis. Except for generalities, it learned little about which of his activities were conducted on his employer's time, and which on his personal time. The court at this time simply does not know what the rights of the employee are in respect to the technology developed by Humes at the time that he was employed at UCP.

In short, as things now stand, this court cannot determine whether the probability that plaintiff will succeed on the merits is little or great. If the facts are as it alleges in its written documents, the probability is great. On the other hand, Humes testified in person and was subjected to cross-exami-

nation, and if the facts are as he swore them to be, the probability may be little. This court simply does not know on the record before it, and since plaintiff has the burden of making the court "know", it has not carried its burden. The court simply does not believe that it can, on this record, enjoin the defendants from plying their trade in an attempt to earn a living.

In fairness to plaintiff's counsel, let the court hasten to say that, by saying this, the court is not, to any degree, critical of the work of plaintiff's counsel in this matter. Instead, the quality of his work and his cooperation is complimented. He attempted to pursue the motion in what may have come to be the traditional manner—by "written evidence". That is certainly the preferable way in the usual case where the facts are not greatly in dispute, since it is most economical from the standpoint of both the parties and the court. However, this court believes that few, if any, injunctions of this type should be granted without first giving the parties an opportunity to appear before the court and present their evidence. When that is done, the court further believes that the record should make it reasonably clear that the movant has carried the burden imposed by law. This record, in the court's view, simply does not do that.

Because of testimony at the trial from Cusimano which indicates that he may not know the significance of the denial of a preliminary motion, the court believes that it is appropriate to make one further observation. All that it is holding in this matter is that the record before it does not support the granting of the severe remedy of a preliminary injunction. However, all concerned should be aware that this is only a preliminary matter and the court, in ruling as it has, has not intended to give any indication as to its belief in respect to the merits of this case. It has said by this memorandum opinion only that the record is not sufficient at this time to support a preliminary injunction. If the court is subsequently supplied with testimony that indicates that the technology of UCP is a trade secret, and that the defendants have misappropriated that technology for their own use, the court will have no qualms about issuing a permanent injunction and awarding UCP all damages which it shows are justified. With that in mind, defendants would be wise to proceed in their endeavors carefully.

The motion for preliminary injunction will be denied by separate order.