UNCLE B'S BAKERY, INC., Plaintiff,

v.

Kevin O'ROURKE and Brooklyn Bagel Boys, Inc., Defendants.

No. C 96–3016–MWB.

United States District Court,
N.D. Iowa,
Central Division.

April 1, 1996.

**1408**

Dennis W. Johnson of Dorsey & Whitney, P.L.L.P., Des Moines, Iowa, for plaintiff Uncle B's Bakery.

Richard H. Moeller of Berenstein, Moore, Moser, Berenstein & Heffernan, Sioux City, Iowa, for defendants Brooklyn Bagel Boys and Kevin O'Rourke.

**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION .................................................... 1409
 A. Procedural Background ..................................... 1409
 B. Findings Of Fact ......................................... 1411
 1. The Provisional Nature Of Findings And Conclusions ... 1411
 2. The bagel makers and their products .................. 1411
 3. Bagels, shelf life, and technology ................... 1412
 4. Uncle B's Bakery's efforts to protect its secrets .... 1413
 5. Kevin O'Rourke's employment with Uncle B's Bakery .... 1416
 6. O'Rourke's employment with Brooklyn Bagel Boys ....... 1420

II. LEGAL ANALYSIS .................................................. 1421
 A. Standards For Preliminary Injunctions .................... 1421
 1. "Dataphase" standards ................................ 1422
 2. Other standards ...................................... 1422
 B. Application Of The Standards ............................. 1423
 1. Likelihood of success on the merits .................. 1423
 a. The law governing misappropriation of trade secrets .. 1424
 i. The Iowa Uniform Trade Secrets Act .......... 1425
 ii. Is the information in question "trade secrets"? .. 1428
 iii. Is there a likelihood of disclosure by "improper means"? .. 1429
 iv. Likelihood of a successful common-law claim .. 1430
 v. Substantial defenses ....................... 1430
 b. Non-competition .................................. 1432
 2. Irreparable harm ..................................... 1434
 3. Balance Of Harm ...................................... 1436
 4. The Public Interest .................................. 1438
 C. The Requirements Of Fed.R.Civ.P. 65(c) & (d) ............. 1438
 1. The scope of a preliminary injunction ................ 1438
 2. Fed.R.Civ.P. 65(c)'s security requirement ............ 1439

III. CONCLUSION ..................................................... 1440

Although the court had not imagined that supermarket bagels could spawn rivalries more intense than that between cream cheese and butter, the court has discovered in this "trade secrets" case that rival bagel makers hone their competitive edges with as much alacrity as other entrepreneurs. Presently before the court is the application of one maker and distributor of supermarket bagels for a preliminary injunction seeking to protect its "trade secrets" in bagel making and packaging by enjoining a former employee from disclosing those secrets to, or working for, a competitor, and the competitor's misappropriation of any of those secrets. The court must decide what is, or was, "secret" in this case, and what "secrets," if any, it should protect. The former employee argues that the "secret" in the case, at least from him, was the non-disclosure and non-competition agreement the bagel maker seeks to enforce against him, but which he claims he never saw, signed, or otherwise agreed to. Governing law and a balance of equities must determine what are protectable secrets in this case, whether those secrets should be protected by a preliminary injunction, and what is the proper scope of such an injunction should the court find that one must issue.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Uncle B's Bakery, Inc., filed its complaint in this matter on February 6, 1996, against defendant Kevin O'Rourke, the for-mer manager of Uncle B's Bakery's Ellsworth, Iowa, plant, and defendant Brooklyn Bagel Boys, Inc., O'Rourke's current employer. Diversity jurisdiction is asserted pursuant to 28 U.S.C. § 1332(a) and (c). Uncle B's Bakery is an Iowa corporation with its principal place of business in Iowa. O'Rourke is a citizen of the State of Virginia, but is currently employed as the plant manager of one of Brooklyn Bagel Boys' bagel manufacturing plants in Franklin Park, a suburb of Chicago, Illinois. Brooklyn Bagel Boys is an Illinois corporation with its principal place of business in Illinois.

Uncle B's Bakery's complaint in this matter is in eight counts, each alleging misconduct under Iowa law following O'Rourke's termination of his employment with Uncle B's Bakery and subsequent employment with Brooklyn Bagel Boys, which Uncle B's Bakery asserts is one of its direct competitors in the business of making and distributing bagels sold through supermarkets. Uncle B's Bakery's claims center upon alleged disclosure by O'Rourke of Uncle B's Bakery's trade secrets and O'Rourke's alleged violation of a non-competition agreement as the actual or threatened results of his employment with Brooklyn Bagel Boys. The complaint also alleges Brooklyn Bagel Boys' misappropriation of Uncle B's Bakery's trade secrets, as well as alleged interference by Brooklyn Bagel Boys with Uncle B's Bakery's prospective business advantage or Uncle B's Bakery's contractual relationship with O'Rourke.[1]

1. Specifically, Count I of the complaint alleges O'Rourke's breach of a confidentiality agreement by using or disclosing to others, without authorization of Uncle B's Bakery, information relating to the production or packaging of food products manufactured and distributed by Uncle B's Bakery. As relief, this count seeks a preliminary and permanent injunction restraining O'Rourke from using or disclosing confidential information or trade secrets in violation of the confidentiality agreement with Uncle B's Bakery, damages, attorneys fees, and costs. Count II alleges breach of a non-competition clause in an employment agreement allegedly signed by O'Rourke when he entered into his employment with Uncle B's Bakery. As relief, this count seeks a preliminary and permanent injunction restraining O'Rourke from accepting or continuing employment with any competitor of Uncle B's Bakery, liquidated damages as specified in the contract of employment in which the non-competition clause is contained, punitive damages, attorneys fees and costs, and such other relief as the court deems proper. Count III alleges intentional interference by Brooklyn Bagel Boys with the contractual relationship between O'Rourke and Uncle B's Bakery. As relief on this claim, Uncle B's Bakery seeks actual and punitive damages and such other relief as the court deems proper. Count III alleges intentional interference by Brooklyn Bagel Boys with the contractual relationship between O'Rourke and Uncle B's Bakery. As relief on this claim, Uncle B's Bakery seeks actual and punitive damages and such other relief as the court deems just and proper. Count IV alleges

The matter immediately pending before the court is Uncle B's Bakery's motion for a preliminary injunction, filed the same day as Uncle B's Bakery's complaint, seeking to enjoin O'Rourke's violation of a non-competition agreement and the defendants' misappropriation of Uncle B's Bakery's trade secrets.[2] In its motion for a preliminary injunction, Uncle B's Bakery also requested an expedited evidentiary hearing. On March 8, 1996, the court granted the request for an expedited hearing, and scheduled a hearing on the motion for a preliminary injunction for March 25, 1996, in Fort Dodge, Iowa.

In the interim, on February 28, 1996, Brooklyn Bagel Boys and O'Rourke filed a joint answer to the complaint denying all of Uncle B's Bakery's claims. In addition, the defendants asserted three affirmative defenses: (1) Uncle B's Bakery's complaint fails to state a claim upon which relief can be granted; (2) Uncle B's Bakery first breached its employment agreement with O'Rourke by failing to pay him for moving expenses and vacation pay; and (3) O'Rourke never signed nor agreed to the terms of any restrictive covenant with Uncle B's Bakery. On February 28, 1996, Brooklyn Bagel Boys and O'Rourke also filed a motion for an extension of time to respond to Uncle B's Bakery's motion for a preliminary injunction. The court granted the defendants' motion for an extension of time, requiring a response to the motion for preliminary injunction on or before March 6, 1996. A timely response to the

motion for preliminary injunction was therefore filed on March 6, 1996.

This matter proceeded to hearing on March 25 and 26, 1996. At the hearing, plaintiff Uncle B's Bakery was represented by counsel Dennis W. Johnson of Dorsey & Whitney, P.L.L.P., in Des Moines, Iowa. Defendants Brooklyn Bagel Boys and Kevin O'Rourke were represented by local counsel Richard H. Moeller of Berenstein, Moore, Moser, Berenstein & Heffernan, in Sioux City, Iowa. At the hearing, Uncle B's Bakery presented numerous exhibits and the testimony of several witnesses, including Uncle B's Bakery's CEO, William Rose, Jr., and six other officers and employees of the company. Defendants also presented exhibits and the testimony of two witnesses, Kevin O'Rourke and Christopher Scott, Brooklyn Bagel Boys' vice president for operations.

At the hearing, the parties submitted a stipulation for a protective order to protect information the parties perceived to be sensitive or confidential from disclosure except to authorized persons and the court. A courtesy copy of the stipulation and proposed protective order had been transmitted to the court by facsimile on March 21, 1996. During the hearing, the court granted the parties' motion for a protective order, and entered the protective order as proposed by the parties. Thus, several portions of the preliminary injunction hearing were closed to the public and the representative for Brook-

---

that Brooklyn Bagel Boys intentionally interfered with a prospective business advantage of Uncle B's Bakery. This claim seeks as relief actual and punitive damages, costs, and such other relief as the court deems just and proper. Count V alleges both defendants have made an actual or threatened misappropriation of Uncle B's Bakery's trade secrets in violation of Iowa Code Ch. 550, the Iowa Uniform Trade Secrets Act. It seeks relief in the form of a preliminary and permanent injunction preventing such misappropriation or threatened misappropriation of trade secrets and requiring affirmative acts, not specified, to protect Uncle B's Bakery's trade secrets, actual and punitive damages, attorneys fees and costs, and such other relief as the court deems just and proper. Count VI alleges O'Rourke's breach of a fiduciary duty to maintain the confidentiality of Uncle B's Bakery's trade secrets, and seeks actual and punitive damages and plaintiff's costs as relief, as well as such other

relief as the court deems just and proper. Count VII alleges that O'Rourke fraudulently misrepresented his intention to work for a competitor of Uncle B's Bakery with intent to deceive Uncle B's Bakery, thus causing a delay in Uncle B's Bakery's efforts to protect its trade secrets. This count also seeks actual and punitive damages, costs, and such other relief as the court deems just and proper. The final count of the complaint, Count VIII, is an alternative to Count VII, alleging negligent misrepresentation. It also seeks actual and punitive damages, costs, and such other relief as the court deems just and proper.

2. Thus, Uncle B's Bakery's motion for a preliminary injunction is the companion motion to the prayers for preliminary and permanent injunctions made in Counts I, II, and V of the complaint.

lyn Bagel Boys, Christopher Scott, also left the courtroom.

The parties declined the opportunity for any post-hearing briefing. This matter is therefore fully submitted.

### B. Findings Of Fact

#### 1. The Provisional Nature Of Findings And Conclusions

Although the court is disposing of Uncle B's Bakery's motion for a preliminary injunction following briefing by all parties and an evidentiary hearing lasting a day and a half, it is well to remember that in the context of preliminary injunction applications, the court typically operates under "severe time constraints" and must customarily decide the motion "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1835, 68 L.Ed.2d 175 (1981). Thus, the Supreme Court in *Camenisch* stated the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1835, 68 L.Ed.2d 175 (1981); *accord Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir.1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and conclusions of law in preliminary injunction rulings); *United States v. Barnes*, 912 F.Supp. 1187, 1190 (N.D.Iowa 1996) (applying the "general rule" of *Camenisch* to a preliminary injunction ruling on the government's request for a preliminary injunction pursuant to 18 U.S.C. § 1345 to enjoin activities of defendants who were allegedly engaged in mail fraud in violation of 18 U.S.C. § 1341). Any findings of fact in this ruling, made either in this section or in the course of the legal analysis, as well as any conclusions of law forming part of the court's determination of whether the issuance of a preliminary injunction is proper in this case, are intended to be subject to this "general rule" and are not to be considered "final." With this caveat in mind, the court turns to the findings of fact upon which Uncle B's Bakery's motion for a preliminary injunction depends as those facts are established by the documentary evidence and testimony presented at the hearing on March 25 and 26, 1996.

#### 2. The bagel makers and their products

Uncle B's Bakery is in the business of producing and distributing what it describes as "fresh, never-frozen bagels" that are sold in supermarket refrigerated cases nationwide. Uncle B's Bakery's bagels are unique in that they are the only never-frozen bagels that are sold in the refrigerated cases of supermarkets. The "fresh, never-frozen" line of bagels sold in refrigerator cases constitutes the majority of Uncle B's Bakery's production and sales. Uncle B's Bakery has also introduced a fresh bagel, also sold in supermarkets, but in bread aisles, in-store bakeries, and deli departments, under Uncle B's Bakery's "Millspring" brand name. According to its market evaluations, Uncle B's Bakery asserts that, while the entire bagel market is growing at a phenomenal rate, "frozen" bagel sales are growing only at a 2–3% rate. Faster growth rates in sales are apparent for "fresh," or bread aisle, bagels, and for refrigerated bagels, currently the smallest share of bagel sales. Uncle B's Bakery's sales of its unique refrigerated product are growing at over 120%, according to Uncle B's Bakery's market estimates. Uncle B's Bakery controls about 48% of the refrigerated bagel sales, but asserts that other bagels sold in the refrigerated case have first been frozen, then "slacked out," or thawed, prior to sale from a store's refrigerated or dairy case. Uncle B's Bakery does not sell a frozen bagel. All of Uncle B's Bakery's bagels are currently sold under its own labels.

Brooklyn Bagel Boys, to the contrary, has the largest share of its production and sales in "frozen" bagels. Thus, its bagels are sold primarily in supermarket freezer sections, but under a variety of private labels, that is, labels bearing a name other than Brooklyn Bagel Boys. In fact, ninety-six percent of Brooklyn Bagel Boys' sales are made under private labels, with only the small remainder of its sales under its own Brooklyn Bagel Boys' label. Like Uncle B's Bakery, Brook-

lyn Bagel Boys also makes a "fresh," or bread aisle, bagel, also sold under private label brand names. As will be discussed more extensively below, the nature of the packaging used by each bagel maker is critical in the present controversy. Although Uncle B's Bakery's bagels are sold in "air tight" bags, Brooklyn Bagel Boys' bagels are sold in plastic bags closed with a plastic fastener, which does not produce an "air tight" seal. Each bagel company involved in this litigation employs its own unique, and secret, recipes for its bagels.

Brooklyn Bagel Boys attempted to cast doubt on Uncle B's Bakery's assertion that the two companies are "direct competitors," because Brooklyn Bagel Boys produces bagels sold in the frozen foods section of supermarkets, while Uncle B's Bakery produces bagels sold in refrigerator cases, as well as in fresh bread, deli, and bakery sections of supermarkets. The court is convinced that whether or not bagel producers consider the slight difference in the location in which their bagels are sold in a supermarket to be of overweening significance to their perception of whether or not their bagels "compete," to consumers, grocery store bagels are grocery store bagels—at least in the absence of any empirical or other evidence to the contrary. By contrast, the court recognizes that a consumer might not conceive of bagel producers as "direct competitors" where one produces grocery store bagels and the other produces fresh bagels sold on site in its own bakery outlets or franchised restaurants. Furthermore, the two companies produce bagels for marketing in some of the same store chains, and virtually identical, nationwide geographical markets. Uncle B's Bakery markets in forty-three states, and Brooklyn Bagel Boys in forty-four, as well as Puerto Rico and the Virgin Islands. Finally, at the preliminary injunction hearing it was demonstrated that the two companies each produce a "fresh," or bread aisle, bagel, and those products do compete directly. Thus, Uncle B's Bakery and Brooklyn Bagel Boys are both direct and indirect competitors in the supermarket bagel business.

### 3. Bagels, shelf life, and technology

Uncle B's Bakery guarantees a ninety-day shelf life for its refrigerated bagels, which its representatives testified is less than the 120 days its testing has indicated is the actual shelf life, thus allowing thirty days for storage and shipping. The shelf life of Uncle B's Bakery's "fresh," or bread aisle, bagels is also long by industry standards, approaching four weeks. The longest shelf life guaranteed by any competitor identified at the preliminary injunction hearing was sixty to seventy days, but the court finds that the vast majority of grocery store bagels sold in the "fresh" bread aisle or refrigerator case typically have a significantly shorter shelf life, usually of less than three weeks. Only "frozen" bagels can rival Uncle B's Bakery's guaranteed shelf life for its refrigerator case bagels, which Uncle B's Bakery achieves without freezing. Uncle B's Bakery presented testimony that it has had less than one percent returns of its product for any reason, including reasons unrelated to its product failing to survive in saleable form for the full duration of the guaranteed shelf life. Uncle B's Bakery believes the industry average for returns is eleven to twelve percent.

Uncle B's Bakery asserts that it is able to maintain the quality and shelf life of both its refrigerated and "fresh" bagel products without freezing owing to confidential and proprietary formulations and manufacturing and packaging processes, including an "air tight" packaging process. At the hearing, it was demonstrated that Uncle B's Bakery's "air tight" packaging process, instrumental in the long shelf life and quality of its products maintained without freezing, involves placing Uncle B's Bakery's bagels in "air tight" bags and back-flushing the bags with medical grade gases to inhibit staling and molding. This process was described as "controlled atmosphere packaging" (CAP), or "modified atmosphere packaging" (MAP). The "air tight" packaging process involves special equipment made exclusively for Uncle B's Bakery. Although the CAP or MAP process has been used for several years for a variety of foods, such as meats and cheeses, Uncle B's Bakery is the only bagel maker and distributor employing this approach to im-

proving product freshness, quality, and shelf life. Although Brooklyn Bagel Boys was aware of the MAP process years ago, like other commercial bakers of bagels and other products, Brooklyn Bagel Boys considered this packaging process too expensive and unnecessary an investment to explore it further. Uncle B's Bakery asserted that the material of the "air tight" bags it employs meets unique specifications and the suppliers of these bags are bound not to disclose Uncle B's Bakery's use of the material in question. Kevin O'Rourke testified, however, that the material used by Uncle B's Bakery for its bags, at least during his tenure with the company, was a "stock" material available from a number of suppliers. The court finds that whether or not the material used is a "stock" material of packaging suppliers, what material is actually used by Uncle B's Bakery for its packaging, the specifications that material must meet, and who actually supplies the bags to Uncle B's Bakery are all "secret." Furthermore, the court finds that there is no reason, based on the preliminary injunction record, that the packaging secrets, as well as some of the other production secrets Uncle B's Bakery treasures, could not be applied to bagels other than refrigerated, never frozen bagels.

Other significant contributors to the long shelf life of Uncle B's Bakery's bagels are its unique recipes, including special ingredients to prevent molding or staling, and its bagel-making processes. Uncle B's Bakery's bagel-making process employs special, assertedly secret, cold treatments to the bagels to shorten the period of "retarding," or refrigerated rising, after the yeast are activated. The "retarding" process is common to various commercial bakery products. However, Uncle B's Bakery employs unique, and secret, methods to shorten significantly this retarding period, cutting the "retarding" time to approximately three-quarters of the period it formerly required. A shorter retarding time obviously increases the daily capacity for bagel production at Uncle B's Bakery's plant. Uncle B's Bakery has also explored other bagel-making techniques focusing on the benefits of specific, assertedly secret, ingredients and processes. As part of the development of special processes, CEO William Rose, Jr., and then plant manager Kevin O'Rourke took an extended trip to Europe to test various techniques employed there. From its research and development, Uncle B's Bakery has developed certain new processes it is currently beginning to implement.

Despite several years of attempting to obtain a "process" patent for its bagel production and bagging process, Uncle B's Bakery has thus far failed to obtain a patent. Nonetheless, Uncle B's Bakery has invested over seven years and several million dollars in developing its freshness technology and processes.

### 4. Uncle B's Bakery's efforts to protect its secrets

Uncle B's Bakery asserts, and the court finds, that it has carefully guarded its trade secrets and confidential information. For example, anyone who visits Uncle B's Bakery's plant is required to sign a confidentiality agreement. Indeed, employees are instructed that if any unescorted person appears in the plant, that person is to be escorted to the company's offices to complete a confidentiality agreement before he or she can conduct any other business or visit any portion of the plant.

The confidentiality agreement signed by visitors, according to the copy of the agreement signed by O'Rourke, states, *inter alia*, that the parties recognize that Uncle B's Bakery "desires to keep its processes and equipment for the production and packaging of its products confidential." Plaintiff's Exhibit 1, Plant Visitor Confidentiality Agreement (hereinafter, "Confidentiality Agreement"), p. 1. The confidential information in question

> includes, but is not limited to, any and all of Company's past, present, or future raw or processed products, ingredients, manufacturing, advertising or design techniques, plans, ideas, formulas, equipment brands and types, processes, methods, and operating conditions not previously publicly known (hereinafter the "Information").

*Id.* The Confidentiality Agreement also states that the parties "consider their rela-

tionship one of confidence with respect to the Information and agree that the Information constitutes valuable trade secrets which are the sole property of Company." *Id.* Visitors signing the Confidentiality Agreement, including O'Rourke, therefore agreed that they would "hold the Information in confidence," and "take all reasonable action to prevent the unauthorized use or disclosure of the Information and to protect the confidentiality of the Company's interests in the Information." *Id.* at p. 2, ¶ 1. Furthermore, the Confidentiality Agreement states that

> Visitor understands that any violation of this Agreement will cause Company immediate and irreparable harm which money damages cannot adequately remedy. Therefore, upon any actual or impending violation of this Agreement, Visitor consents to issuance by any court of competent jurisdiction, a restraining order, preliminary injunction, and/or permanent injunction, without bond, restraining or enjoining such violation by Visitor or any entity or person acting in concert with Visitor. Visitor understands that such orders are in addition to, and do not limit, any other remedies available to the Company.

*Id.* at p. 2, ¶ 2. The Confidentiality Agreement further provides that it "shall remain valid and in effect indefinitely," *id.* at p. 2, ¶ 3, and that "[i]n the event that Visitor enters the Plant at a future date, Visitor will remain bound by this Agreement and will not be required to sign an additional Agreement." *Id.* at p. 2, ¶ 4.[3]

As a further example of Uncle B's Bakery's efforts to maintain confidentiality of its manufacturing processes, Uncle B's Bakery extracts from all of its suppliers a more comprehensive confidentiality agreement, requiring the suppliers to keep confidential Uncle B's Bakery's use of particular machinery or supplies. In a number of cases in which Uncle B's Bakery believes that particularly unique or sensitive technology or supplies are used in its production or bagging processes, it has extracted "exclusivity" agreements from key suppliers, forbidding the suppliers from providing identical products to Uncle B's Bakery's competitors, as well as requiring them not to disclose Uncle B's Bakery's use of such products.

Furthermore, Uncle B's Bakery requires all employees to enter into a "Non–Disclosure/Non–Compete" Agreement before commencing employment with the company. The "Non–Disclosure/Non–Compete" Agreement defines the confidential information to which it pertains as

> the following categories of information (hereinafter the "Trade Secrets and Confidential Information"): the development of original and unique recipes, ingredients, manufacturing techniques, packaging techniques, proceses [sic] involved in the production and/or packaging of Employer's products, equipment brands and types used, and trade secrets for the production and packaging of bread products.

Plaintiff's Exhibit 3, "Non–Disclosure/Non–Compete" Agreement, p. 1. For essentially the same reasons stated in the Confidentiality Agreement described above, the "Non–Disclosure/Non–Compete" Agreement embodies the signatories' agreement to the following terms significant in the context of the present motion for a preliminary injunction:

> 2. *NON–DISCLOSURE* Employee agrees that such Trade Secrets and Confidential Information, as set forth above, are the property of the Employer and that any of the Trade Secrets and Confidential Information hereafter revealed to Employee directly or indirectly are revealed in strict confidence. Employee expressly agrees and covenants to keep and respect such confidences and shall not, during or after the term of employment, disclose Employ-

---

**3.** The Confidentiality Agreement has other provisions not pertinent to this preliminary injunction ruling. For example, it also provides that in any dispute under the Confidentiality Agreement involving litigation, the prevailing party shall be entitled to attorney fees and other costs in addition to all other remedies; it provides that it is a fully integrated contract that is binding on suc-

cessors and that is made and to be performed in the state of Iowa, "whose substantive laws, without regard to conflicts of law, shall apply to its construction and enforcement"; and it provides that the visitor acknowledges receipt and review of a copy of the agreement before signing it and understands all of its terms.

er's Trade Secrets and Confidential Information to any person, business, corporation, or other entity for any reason or purpose unless explicitly authorized by Employer.

3. *NON–COMPETE* It is expressly understood and agreed that during Employee's training and employment, Employee will be exposed to Employer's Trade Secrets and Confidential Information and will therefore become a valuable asset. Employee expressly agrees and covenants not to compete directly or indirectly, nor have an interest in any business, corporation or other entity which competes directly or indirectly, nor work for any person, business, corporation or other entity which competes directly or indirectly with Employer within a 500 mile radius of any of Employer's marketing outlets either during the term of Employee's employment or for a period of five years thereafter.

4. *INJUNCTION* It is expressly understood and agreed that in the event of the violation by Employee of this agreement or of the threatened violation thereof, the Employer shall be entitled to obtain an injunction enjoining and restraining Employee from violating the terms of this agreement. Employee consents upon such violation or threatened violation to the issuance of an exparte [sic] temporary injunction until such time as opportunity for hearing thereon be granted upon notice prescribed by the courts.

"Non–Disclosure/Non–Compete" Agreement, p. 2.[4] The "Non–Disclosure/Non–Compete" Agreement also provides that it "shall be construed according to the laws of" the State of Iowa. *Id.* at p. 3, ¶ 9.[5]

A good share of the testimony of Uncle B's Bakery's witnesses was devoted to establishing that it is a company policy, with no exceptions, that every employee, down to the lowest levels, immediately sign a "Non–Disclosure/Non–Compete" Agreement upon starting employment with Uncle B's Bakery, and the court finds that this was indeed the policy. Based on the uniformity with which the policy was enforced, the court finds that it would be only in the most extraordinary of circumstances that this policy would not be known to a particular employee. Upon arriving to start employment, the company's protocol is for each new employee of Uncle B's Bakery to be presented with a packet of forms he or she must sign. This packet includes, in addition to W–2 forms and forms required by the Immigration and Naturalization Service, an "Non–Disclosure/Non–Compete" Agreement. The employee is required to complete all forms, and Uncle B's Bakery's Human Resources Manager, JoAnn Kuhfus, or her assistant, then reviews all forms for completeness and correctness. If all forms have not been completed, Ms. Kuhfus testified that she "followed up" with that employee until all forms were completed. She testified that no employee had ever refused to sign the "Non–Disclosure/Non–Compete" Agreement, but if that occurred, she would likely refer the matter to her direct supervisor, CFO Howard McClellan. Witnesses for Uncle B's Bakery had reviewed the personnel files of all current employees and those employees to depart during 1995, numbering approximately 160 files, and could discover only two in which a signed "Non–Disclosure/Non–Compete" Agreement could not be found. One file missing a "Non–Disclosure/Non–Compete" Agreement was Kevin O'Rourke's. The entire file of another employee, Mr. Conrad, could not be located

---

**4.** Another form of the "Non–Disclosure/Non–Compete" Agreement, also acknowledged to have been used by Uncle B's Bakery at some time, stated a non-competition period of only two years. However, the parties stipulated that such agreements with a five-year non-competition period were signed by two new employees, one on February 9, 1994, shortly before O'Rourke began his employment with Uncle B's Bakery, and another in the fall of 1993, as indicative of when the change over from a two-year to a five-year non-competition period occurred in the standard

"Non–Disclosure/Non–Compete" Agreement employed by the company.

**5.** Additional terms of the "Non–Disclosure/Non–Compete" Agreement not relevant at this stage of the proceedings pertain to damages and other remedies for breach of its terms, a non-waiver of the employer's rights under the agreement except in writing signed by the employer, and attorneys' fees and costs in actions to protect the employer's rights under the agreement.

at all. His file had been sent to the company's attorneys when Mr. Conrad threatened litigation after termination for poor performance, and the attorneys had been unable to find and return it as of the time of the preliminary injunction hearing.

The court finds the evidence that Uncle B's Bakery's policy is that all employees sign "Non–Disclosure/Non–Compete" Agreements is overwhelming. Although perhaps less well founded in objective evidence, the court also finds that, in general, employees of Uncle B's Bakery were aware of the requirement that they sign a "Non–Disclosure/Non–Compete" Agreement. Adherence to Uncle B's Bakery's policy of requiring "Non–Disclosure/Non–Compete" Agreements from its employees has been so nearly unanimous, and the knowledge among the workforce that such agreements are required is so general, as to raise a reasonable inference that the apparent exceptions, O'Rourke and Conrad, also conformed to the policy by entering into "Non–Disclosure/Non–Compete" Agreements. O'Rourke has attempted to rebut that inference as to him, and the court considers below whether his argument that he never saw, signed, or knew about such an agreement sufficiently undermines Uncle B's Bakery's likelihood of success on the merits to preclude entry of a preliminary injunction enjoining his employment with a competitor.

### 5. Kevin O'Rourke's employment with Uncle B's Bakery

It is undisputed that Kevin O'Rourke was hired as the production manager for Uncle B's Bakery's Ellsworth, Iowa, plant in early 1994. O'Rourke was recruited by Uncle B's Bakery from his position as plant manager for a supermarket chain in Richmond, Virginia, where his duties included managing a bakery and bagel manufacturing plant. O'Rourke came to work for Uncle B's Bakery on February 15, 1994. It is also undisputed that, as plant manager, O'Rourke was privy to and, in most cases, deeply involved in the development or implementation of all of the matters Uncle B's Bakery asserts are secret concerning the operations of its Ellsworth plant. O'Rourke was at least generally aware of matters outside of bagel production

as well, such as sales, accounting, purchasing, and planning, because of his involvement with other members of Uncle B's Bakery's management team in regular company meetings. Thus, the most significant factual questions here involve whether O'Rourke was bound by Uncle B's Bakery's ubiquitous Confidentiality Agreement, "Non–Disclosure/Non–Compete" Agreement, or both.

Uncle B's Bakery entered into evidence a copy of a visitor confidentiality agreement signed by Kevin O'Rourke on December 14, 1993, prior to O'Rourke's employment with Uncle B's Bakery. In addition to O'Rourke's signature, the confidentiality agreement bears the signature of a representative of Uncle B's Bakery, its CFO, Howard McClellan, who also initialed as a witness to O'Rourke's signature. Although defendants asserted as an affirmative defense in their answer that O'Rourke had neither signed nor agreed to the terms of any restrictive covenants with Uncle B's Bakery, defendants also admitted in their answer that O'Rourke visited Uncle B's Bakery's production facility in Ellsworth, Iowa, on or about December 14, 1993, and that he signed a confidentiality agreement that day. O'Rourke's executed copy of the Confidentiality Agreement was not kept in his personnel file, but in William Rose, Jr.'s own files, as O'Rourke was a candidate for a high position in the company. The usual practice of the company is to keep executed visitor Confidentiality Agreements in a file in the reception area.

Although the parties agree, and the court finds, that O'Rourke signed the Confidentiality Agreement described above, a significant bone of contention at the preliminary injunction hearing was whether O'Rourke had ever signed a non-disclosure/non-compete agreement upon which Uncle B's Bakery also founds its demand for a preliminary injunction enjoining misappropriation of trade secrets, as well as its further demand for a preliminary injunction enjoining violation of a non-competition agreement. Although it could produce no executed copy, either with its complaint, as an attachment to its motion for a preliminary injunction, or as an exhibit in the preliminary injunction hearing, Uncle B's Bakery asserts that O'Rourke, upon en-

tering into his employment as plant manager of Uncle B's Bakery's Ellsworth, Iowa, plant, signed a "Non–Disclosure/Non–Compete" Agreement of the form described above. The defendants contend to the contrary. O'Rourke asserts, not only that he never saw nor signed such an agreement, but that he never required any employee he hired for Uncle B's Bakery to sign such an agreement. O'Rourke contends further that he never received nor signed any contract of employment at all, but only received a letter from Uncle B's Bakery's Chairman and CEO, William Rose, Jr., stating the terms of his employment.

Although all the rest of the usual forms were found in Mr. O'Rourke's personnel file, no signed "Non–Disclosure/Non–Compete" Agreement could be located. Ms. Kuhfus could not recall whether she had ever seen an executed copy of O'Rourke's "Non–Disclosure/Non–Compete" Agreement in his personnel file. Lacking any positive evidence of his agreement to the terms of the "Non–Disclosure/Non–Compete" Agreement, in the form of a signed copy of the agreement, the court is confronted with a credibility contest concerning whether O'Rourke ever entered into such an agreement. Witnesses for the two sides tell markedly different versions of the circumstances under which O'Rourke either did or did not sign the "Non–Disclosure/Non–Compete" Agreement.

Both William Rose, Jr., and William Rose, Sr., testified that the two of them had cleaned and readied O'Rourke's office for his arrival in mid-February of 1994, and that O'Rourke arrived somewhat earlier than expected late in the afternoon of February 15, 1994. William Rose, Sr., testified that the Roses greeted O'Rourke, showed him his office, and then asked him to execute the "Non–Disclosure/Non–Compete" Agreement, which was the only portion of a new employee's packet they considered essential to get signed immediately. William Rose, Sr., testified that he observed O'Rourke sign the agreement, then countersigned it himself. William Rose, Jr., then took the executed "Non–Disclosure/Non–Compete" Agreement and placed in on a desk in the reception area, as Jo Kuhfus was gone for the day by that

time. O'Rourke was then given another tour of the plant before the Roses left him to settle into his office.

Uncle B's Bakery's explanation for the absence of an executed "Non–Disclosure/Non–Compete" Agreement from O'Rourke's personnel file centers on O'Rourke's motive and opportunity to remove the agreement from his personnel file when he determined to accept employment with a competitor. O'Rourke did not deny that he had access to a lockbox in the office area that contained keys to JoAnn Kuhfus' office, where all personnel records were kept, and that he was, upon several occasions, the only person in that area of the plant. However, O'Rourke denied removing anything from his file prior to his departure from Uncle B's Bakery's employment. O'Rourke testified that he was aware of two forms of the Confidentiality Agreement, the visitor's form and the more extensive form for suppliers and key persons associated with the company. However, he testified that, until the hearing, he was unaware of any "Non–Disclosure/Non–Compete" Agreement. When asked about a copy of the "Non–Disclosure/Non–Compete" Agreement of another employee that he had countersigned, which Uncle B's Bakery had introduced as demonstrating that O'Rourke was indeed aware of the "Non–Disclosure/Non–Compete" Agreement, O'Rourke testified that he had believed the document in question at the time was simply the longer form of the confidentiality agreement he knew was used by the company. O'Rourke testified that he had witnessed the execution of the document only because no one from human resources was then available to take care of it.

O'Rourke's explanation for the absence of a "Non–Disclosure/Non–Compete" Agreement from his file is simpler than Uncle B's Bakery's: He simply never signed one. O'Rourke testified that no non-competition agreement was ever discussed prior to his employment, although confidentiality agreements were discussed extensively. His version of events on the day he arrived was that he was not asked to sign nor presented with any "Non–Disclosure/Non–Compete" Agreement, although he agreed that the Roses had

been preparing his office when he arrived, did greet him, and then took him on a tour of the plant. O'Rourke testified that at some time shortly after his arrival, although the exact timing is uncertain, he received the usual packet of forms for new employees, but that it did not contain a "Non–Disclosure/Non–Compete" Agreement. The portion of O'Rourke's personnel file submitted into evidence shows that all of the other usual employment forms were executed a week or ten days after O'Rourke's arrival.[6]

The court finds both O'Rourke's and William Rose, Sr.'s versions of the signing or non-signing of the "Non–Disclosure/Non–Compete" Agreement to be plausible, and that the witnesses presenting those differing versions were credible. Indeed, the credibility assessment here is perhaps the closest the court has encountered in a civil case. Whether or not Uncle B's Bakery can ultimately prevail on its claim of breach of the "Non–Disclosure/Non–Compete" Agreement depends upon whether or not O'Rourke signed or otherwise agreed to be bound by such an agreement. However, for the purposes of a preliminary injunction, the court may not need to make even a provisional credibility finding, because the court's role is to determine the movant's likelihood of success on the merits, not predict the outcome of the movant's claim. Thus, the court will make only such provisional findings as it must concerning the execution of the "Non–Disclosure/Non–Compete" Agreement and only after discussing, in the legal analysis portion of this ruling, precisely what and to what extent factual issues must be resolved.

O'Rourke contends that the only employment agreement he ever signed was not the "Non–Disclosure/Non–Compete" Agreement proffered by Uncle B's Bakery, but a letter from Uncle B's Bakery's CEO, William Rose, Jr., to O'Rourke, dated January 10, 1994. That letter states certain terms of Uncle B's Bakery's employment offer to O'Rourke. This letter is also the foundation of defendants' affirmative defense that Uncle B's Bakery first breached the terms of its employment agreement with O'Rourke. O'Rourke asserts that Uncle B's Bakery breached the terms stated in that letter pertaining to paid vacation and an allowance for moving costs. Thus, the pertinent parts of the January 10, 1994, letter, at least for the present purposes, are as follows:

Dear Kevin:

To confirm our discussion, for [sic] following are the terms of our employment offer:

\* \* \* \* \* \*

*Two weeks paid vacation the first year of employment, with increases as the board designates.

\* \* \* \* \* \*

*$5,000 allowance for moving cost. $1000 to $2500 now and remainder if needed for family move.

Plaintiff's Exhibit 2, Letter of January 10, 1994. The January 10, 1994, letter is signed by "Bill Rose," and, under the typed heading "Agreed to and accepted by:", is signed by Kevin O'Rourke, with the accompanying date of "1/10/94." *Id.*

Whatever the controversy over O'Rourke's signing of a "Non–Disclosure/Non–Compete" Agreement, it is clear that the employment relationship between O'Rourke and Uncle B's Bakery did not remain amicable for long. By the fall of 1995, O'Rourke began seeking other employment. O'Rourke testified that his renewed job search was prompted by an on-going disagreement with Uncle B's Bakery's upper management centering on the failure of Uncle B's Bakery to reimburse O'Rourke for moving expenses as promised in the January 10, 1994, letter from Mr. Rose. He also testified that his disenchantment with Uncle B's Bakery also stemmed from two public "dressings down" he had received from William Rose, Jr., at trade shows or public functions, concerning production and quality at the bagel plant. After one of these public dressings down, O'Rourke testified that a Uncle B's Bakery shareholder and member of its board of directors, who was also a supplier of some of Uncle B's Bakery's unique production equipment, told

---

**6.** The dates on these documents are indicated as either February 23 or February 24, 1994, which O'Rourke testified was probably simply his mistake about the date on some of the documents, because all were executed at the same time.

O'Rourke he had taken enough, and that the shareholder would assist O'Rourke in looking for other employment. That shareholder, according to O'Rourke, informed him of an opening for a plant manager at Brooklyn Bagel Boys and made the initial contacts with Brooklyn Bagel Boys on his behalf. O'Rourke eventually tendered his resignation on November 6, 1995, to become effective December 1, 1995.

William Rose, Jr., however, testified that O'Rourke became annoyed with him when he refused to make him a loan under the guise of an advance of moving expenses. Rose testified that he told O'Rourke he was not entitled to any more moving money until he moved his family from Virginia. Although Rose asserted that all of O'Rourke's own moving expenses had been paid, he produced no documentary evidence of such payments at the preliminary injunction hearing. O'Rourke testified that he had never been reimbursed or paid any of the $1,000 to $2,500 the letter of January 10, 1994, indicated he was entitled to up front.

The court need not resolve any question concerning why O'Rourke decided to leave his position, nor, indeed, need the court determine whether or not Uncle B's Bakery breached the employment agreement embodied in the January 10, 1994, letter, in order to determine whether O'Rourke is bound by the Confidentiality Agreement he undeniably signed or the "Non–Disclosure/Non–Compete" Agreement he contends he did not sign. Both of those agreements are independent of the terms of the January 10, 1994, letter.

Both of the Roses testified that after he submitted his resignation, O'Rourke assured them that he would not be going to work for a competitor. Other of Uncle B's Bakery's witnesses also testified that O'Rourke had led them to believe that his new job was not with a competitor.[7] O'Rourke stated in an affidavit submitted in resistance to the motion for a preliminary injunction that he never told anyone where he was going to be employed next, because at the time of his resignation he did not know which of several employment offers he was going to accept. However, at the preliminary injunction hearing, O'Rourke testified that, although he had other employment prospects, he had chosen Brooklyn Bagel Boys by the time he had advised the Roses that he was leaving. The reason he declined to state where he was going, he testified, was that he did not want to compromise the Uncle B's Bakery shareholder who had assisted him in finding other employment.

Once he had made up his mind to leave, O'Rourke testified that he never gave any assurances that he would not work for a competitor, although he testified that he told the Roses and other Uncle B's Bakery employees that they need have no fears about his breaching any confidentiality agreement. O'Rourke testified that William Rose, Jr., at one time reminded him that he could not work for a competitor because of the non-competition agreement he had signed. O'Rourke testified that he responded that he had never signed any such agreement. O'Rourke testified that William Rose, Jr., became agitated, and went looking for the "Non–Disclosure/Non–Compete" Agreement O'Rourke had purportedly signed, but could not find it. O'Rourke testified that the Roses thereafter pestered him to sign a "Non–Disclosure/Non–Compete" Agreement, but that he saw no reason to when he had promised to honor his obligations not to disclose their confidential information. Certainly, no "Non–Disclosure/Non–Compete" Agreement was signed at that time.

The court finds that the question of whether a preliminary injunction should issue in this case will turn on whether O'Rourke is bound by the Confidentiality Agreement, the "Non–Disclosure/Non–Compete" Agreement, or both, not on whether or not O'Rourke misled Uncle B's Bakery's representatives concerning where he would next be em-

---

7. The court finds no reason here to address or resolve the conflicting testimony concerning whether O'Rourke indicated to co-workers at Uncle B's Bakery prior to his departure that he was going to get even with the Roses or instead only suggested that the Roses were going to damage their own business for reasons unrelated to him.

ployed.[8] Believing that it should not make any unnecessary findings of fact, even provisional ones, on a preliminary injunction record, the court will address other matters.

### 6. O'Rourke's employment with Brooklyn Bagel Boys

Whatever assurances were or were not given about his future employment, O'Rourke accepted employment with Brooklyn Bagel Boys, and began working as the plant manager of one of Brooklyn Bagel Boys' two bagel production plants in Franklin Park in December of 1995. Another very significant factual dispute involves whether O'Rourke's employment with Brooklyn Bagel Boys necessarily threatens disclosure of Uncle B's Bakery's confidential information and trade secrets, as well as whether it violates the terms of O'Rourke's purported non-competition agreement with Uncle B's Bakery. Uncle B's Bakery asserts that O'Rourke's employment with a "direct competitor" necessarily threatens disclosure and misappropriation of Uncle B's Bakery's trade secrets, because of the managerial position O'Rourke held with Uncle B's Bakery and now holds with Brooklyn Bagel Boys and the information he was privy to while employed with Uncle B's Bakery.

The court found above that Brooklyn Bagel Boys is indeed a direct competitor of Uncle B's Bakery's in the "fresh," bread aisle bagel market, and is at least an indirect competitor in the more broadly defined "supermarket" bagel market. Defendants, however, presented the testimony of Christopher Scott that Brooklyn Bagel Boys has specifically asked O'Rourke *not* to divulge any trade secrets of Uncle B's Bakery concerning its recipes, manufacturing processes, and, more particularly, its "air tight" packaging processes. He testified that Brooklyn Bagel Boys was already aware of the MAP process, and had rejected it as neither commercially necessary nor commercially feasible. He testified that Brooklyn Bagel Boys therefore does not use and has no plans to develop or employ an "air tight" packaging process in its production process, so there is little risk that it will appropriate Uncle B's Bakery's "air tight" freshness secrets. He also testified that Brooklyn Bagel Boys has no intention or interest in branching out into the refrigerated bagel business, but stated that if one of its private label customers specifically requested that Brooklyn Bagel Boys make such a product, and could demonstrate a commercially viable ground for doing so, Brooklyn Bagel Boys would probably try to fulfill that demand. Both O'Rourke and Scott testified that, to date, O'Rourke has *not* disclosed any trade secrets of Uncle B's Bakery, and that it is not necessary for him to do so in the performance of his job with Brooklyn Bagel Boys, because of his own fund of experience with the bagel-making and distributing business, as the result of years of experience in the field, and because of the significant differences between Brooklyn Bagel Boys' recipes and processes and those employed by Uncle B's Bakery. Scott and O'Rourke both asserted that Brooklyn Bagel Boys has its own recipes and manufacturing processes for bagels, which differ significantly from Uncle B's Bakery's, and that Brooklyn Bagel Boys has no desire or motivation to change its own successful recipes and processes. O'Rourke, who is the only witness thoroughly familiar with both production systems, asserted that it would be impossible to revamp Brooklyn Bagel Boys's present production line to incorporate Uncle B's Bakery's unique process. Most specifically, Brooklyn Bagel Boys' bagel production system involves no "retarding" process, which, even under Uncle B's Bakery's unique cold treatment, still takes several hours, and there is no practicable way to introduce such a process into the Brooklyn Bagel Boys production system at this time. Furthermore, Brooklyn Bagel Boys has just conducted a major expansion involving the completion of

---

**8.** The testimony concerning these supposed assurances may convince a trier of fact that Uncle B's Bakery was lulled into a false sense of security in order to conceal from Uncle B's Bakery that O'Rourke was going to work for a competitor and to delay Uncle B's Bakery's discovery of the threat of disclosure of its trade secrets. This factual controversy may be pertinent to some of the claims in Uncle B's Bakery's lawsuit, but the court finds that it is unnecessary to resolve, even provisionally, whether assurances were given in order to rule on the application for a preliminary injunction.

another bakery production line for non-bagel products, and no further expansions are contemplated.

Although the court accepts this testimony at its face value, the court nonetheless finds that Uncle B's Bakery has reason to be concerned about disclosure of its trade secrets and confidential information as the result of O'Rourke's employment with Brooklyn Bagel Boys. The reasons for that conclusion are discussed below, following the court's examination of the standards for determining whether Uncle B's Bakery has shown a threat of irreparable harm from O'Rourke's employment with Brooklyn Bagel Boys.

With this factual background in mind, recognizing that it at best provides the court with a provisional record upon which to base decisions of some significance to the parties, the court turns to the legal analysis of Uncle B's Bakery's motion to enjoin disclosure and misappropriation of trade secrets and improper employment of a former employee with a competitor. With the proper legal framework in mind, the court will return to some of the necessary factual determinations it must make in order to resolve the question of whether a preliminary injunction should issue in this case.

## II. LEGAL ANALYSIS

### (Including some further preliminary findings of fact)

#### A. Standards For Preliminary Injunctions

In their briefs, admittedly prepared under the "severe time constraints" that necessarily attend prosecution of a motion for a preliminary injunction, the parties have given but little attention to the standards applicable to a motion for a preliminary injunction.[9] This slim discussion of the applicable standards may be attributable, as well, to the fact that it is well-settled in this circuit that

applications for preliminary injunctions are generally measured against the standards set forth in the decision of the Eighth Circuit Court of Appeals in *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (en banc). Whatever the reason for largely leaving to the court the responsibility for discovering the proper standards, there is little danger that the court will act in ignorance of those standards, because this court has several times during the last year or so extensively discussed in published opinions the *Dataphase* standards for granting a temporary restraining order or issuing a preliminary injunction. *See United States v. Barnes,* 912 F.Supp. 1187, 1192–93 (N.D.Iowa 1996) (applying *Dataphase* standards to motion for preliminary injunction under 18 U.S.C. § 1345 after finding a correlation between the *Dataphase* standards and the special requirements of the fraud injunction statute); *Heather K. v. City of Mallard,* 887 F.Supp. 1249, 1256–66 (N.D.Iowa 1995) (ruling on application for TRO in ADA case, which sought to enjoin municipality's open burning ordinance which was causing injury to child with severe respiratory problems, including explication and application of each of the *Dataphase* factors); *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1243–49 (N.D.Iowa 1995) (ruling on application for preliminary injunction, which sought to enjoin conduct by a former salesman in violation of a covenant not to compete, also including discussion and application of *Dataphase* factors); *Sports Design and Development, Inc. v. Schoneboom,* 871 F.Supp. 1158, 1162–65 (N.D.Iowa 1995) (concluding standards are the same for a TRO or preliminary injunction, citing *S.B. McLaughlin & Co. v. Tudor Oaks Condominium Project,* 877 F.2d 707, 708 (8th Cir. 1989), and applying those standards from *Dataphase* in case involving alleged trademark infringement of fishing lures); *but see Terra Int'l, Inc. v. Mississippi Chem. Corp.,* 896 F.Supp. 1468, 1473 (N.D.Iowa 1995)

---

**9.** Indeed, in its brief, Uncle B's Bakery, the party upon whom the burden to show entitlement of preliminary injunction devolves, does not so much as list or identify the standards by which a motion for a preliminary injunction is to be decided, instead relying entirely on two federal

cases from this district in which the court enjoined a former employee's employment with a competitor, either to enjoin possible disclosure of the former employer's trade secrets or to enforce a non-competition agreement.

(*Dataphase* factors are *not* applicable to a motion for a preliminary injunction to enjoin a second-filed action, citing *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1004 (8th Cir.1993)). The court will not expound upon those standards extensively here. The important point is that the standards generally applicable to issuance of either a temporary restraining order or a preliminary injunction in this circuit are set out in the seminal *Dataphase* decision. *See Dataphase Sys., Inc.*, 640 F.2d at 113 & n. 5.

### 1. "Dataphase" standards

■ Over the last decade and a half, the Eighth Circuit Court of Appeals has repeatedly cited the standards stated in *Dataphase* as the basis on which courts are to determine whether or not to issue a preliminary injunction in a civil case. *Heather K.*, 887 F.Supp. at 1256–57 (citing Eighth Circuit Court of Appeals cases applying these standards). The Eighth Circuit Court of Appeals most recently applied these standards in *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958 (8th Cir.1995). One recent formulation of the *Dataphase* standards is as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Sys., Inc. v. C L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556 (8th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).

*Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir.1994). The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994); *Modern Computer*

*Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir.1989) (*en banc*). "No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op.*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir.1987), and also citing *Dataphase*).

### 2. Other standards

■ Although the *Dataphase* standards are *generally* applicable to motions for preliminary injunctions in civil cases in this circuit, the court cannot pass on without comment on at least two other candidates in this case for articulations of the applicable standards. First, in another diversity action also involving efforts by a former employer to enjoin competition by a former employee purportedly in violation of a non-competition agreement, this court considered whether the *Erie* doctrine, requiring application of state law to substantive questions in diversity cases, required application of state or federal standards to issuance of a preliminary injunction. *See Curtis 1000, Inc.*, 878 F.Supp. at 1243–44. In *Curtis 1000*, this court concluded that it should apply federal rather than Iowa law to the determination of whether a preliminary injunction should issue in that case, because, the court found, federal courts are to apply their own rules of civil procedure, including *Fed.R.Civ.P.* 65, which incorporates traditional federal equity practice for the issuance of preliminary injunctions. *Id.* at 1244. The parties here have not raised the question of whether state or federal law applies to the issuance of a preliminary injunction in this case, this court has decided the question in a prior decision and finds no ground to abandon that decision, and, furthermore, again as in *Curtis 1000*, the court concludes that, as a practical matter, application of federal rather than Iowa law to the question before the court would not be "outcome determinative," as Iowa courts apply roughly the same test as do federal courts of this circuit to issuance of a preliminary injunction, although the Iowa standard may in fact be more lenient. *Id.* Therefore, the court will look to the federal

standards, rather than state standards, for issuance of a preliminary injunction.

That is not the end of the potentially applicable standards in this case, however, any more than it was the end of the question in *Curtis 1000.* In both this case and *Curtis 1000,* the court has been confronted with purported agreements between the parties stating standards applicable to issuance of a preliminary injunction in the circumstances alleged here, breach of a confidentiality agreement and breach of a non-competition agreement. *See Curtis 1000,* 878 F.Supp. at 1249–51. In *Curtis 1000,* the parties had entered into a non-competition agreement which provided that the employer need only prove the existence of a breach of the covenant not to compete, not proof of each of the *Dataphase* factors, in order to be entitled to injunctive relief. *Id.* at 1250. Here, the court notes that the Confidentiality Agreement signed by O'Rourke provides that the parties recognize that "any violation of this Agreement will cause Company immediate and irreparable harm which money damages cannot adequately remedy," and "[t]herefore, upon any actual or impending violation of this Agreement," O'Rourke consented to issuance of a preliminary injunction, "without bond," enjoining violation of the Confidentiality Agreement. Confidentiality Agreement, p. 2, ¶ 2. Furthermore, the "Non–Disclosure/Non–Compete" Agreement O'Rourke is purported to have signed also contains provisions governing issuance of a preliminary injunction, which provide that "[i]t is expressly understood and agreed that in the event of the violation by Employee of this agreement or of the threatened violation thereof, the Employer shall be entitled to obtain an injunction enjoining and restraining Employee from violating the terms of this agreement," and stating the employee's consent to issuance of an *ex parte* TRO upon any violation or threatened violation of the agreement. "Non–Disclosure/Non–Compete" Agreement, p. 2, ¶ 4.

Thus, these contractual standards for issuance of a preliminary injunction are even broader than those encountered in *Curtis 1000,* because they provide for issuance of a preliminary injunction upon proof of either a violation, *or threatened violation,* of the terms of the agreements, without proof of each of the *Dataphase* factors, in order to be entitled to injunctive relief. *Cf. Curtis 1000,* 878 F.Supp. at 1250 (preliminary injunction to issue on proof of a breach of the non-competition agreement). As in *Curtis 1000,* the court concludes that these contractual standards are not at odds with Eighth Circuit Court of Appeals standards, because "the Court of Appeals of this circuit has held that irreparable harm 'can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.'" *Id.* (quoting *Overholt Crop Ins. Serv. Co. v. Travis,* 941 F.2d 1361, 1371 (8th Cir.1991)). Furthermore, the principle of freedom of contract is entitled to some precedence where courts have accepted certain restraints on trade. *Id.* However, as in *Curtis 1000,* the court again concludes that it need not decide whether to apply *Dataphase* standards or contractual standards in this case, at least not immediately, because "if in this case [Uncle B's Bakery] is entitled to a preliminary injunction under the more stringent standards established by *Dataphase* and its progeny, then the court need not consider the lower threshold purportedly set by the contract[s]." *Id.* at 1250–51. Only if the court concludes that Uncle B's Bakery is not entitled to a preliminary injunction under the *Dataphase* standards will it return to the question of whether Uncle B's Bakery is nonetheless entitled to a preliminary injunction under the contractual standards.

### B. Application Of The Standards

The court will consider Uncle B's Bakery's motion for a preliminary injunction in light of each of the *Dataphase* factors in turn, to determine whether these factors weigh in favor of enjoining, to some extent, the conduct of either O'Rourke or Brooklyn Bagel Boys. The court reserves for further consideration below the question of the extent or scope of any injunctive relief, should the court first determine that issuance of a preliminary injunction is appropriate.

### 1. Likelihood of success on the merits

■ The first factor considered by the courts under *Dataphase* when ruling on an

**1424**

application for a TRO or preliminary injunction is the likelihood or probability of success on the merits. *Pottgen,* 40 F.3d at 929. When considering this factor, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir.1991); *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984) (in such preliminary proceedings, "the court should avoid deciding with any degree of certainty who will succeed or not succeed."). In isolation, the likelihood of success on the merits is meaningless. *Glenwood Bridge,* 940 F.2d at 371 (quoting similar language in *Dataphase* ). Therefore, the court must consider other factors, especially the threat of irreparable harm. *Id.*

■ In order to weigh in the movant's favor, the movant's success on the merits must be "at least ... sufficiently likely to support the kind of relief it requests." [10] *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 488 (8th Cir.1993) (action under the Lanham Act in which the court concluded that either result argued by the opposing parties was directly supported by the evidence presented). Thus, likelihood of success on the merits requires that the movant find support for its position in governing law. *See, e.g., Baker Elec. Co-op,* 28 F.3d at 1473–74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Inv., Inc. v. City of Rochester,* 25 F.3d 1413, 1416 (8th Cir.) (first amendment and prior restraint of expression), *cert. denied,* —— U.S. ——, 115 S.Ct. 578, 130 L.Ed.2d 493 (1994); *City of*

*Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556–58 (8th Cir.1993) (Indian tribe's regulatory authority and authority of states to regulate activities on tribal lands), *cert. denied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994); *Aziz v. Moore,* 8 F.3d 13, 15 (8th Cir.1993) (denial of injunctive relief proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief,' " quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)). The court therefore must consider what law governs Uncle B's Bakery's claims concerning misappropriation of trade secrets and violation of a non-competition agreement.

### a. The law governing misappropriation of trade secrets

■ In this diversity action, the *substantive* law governing Uncle B's Bakery's trade secrets claim is Iowa law. *See generally Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Austin v. Super Valu Stores, Inc.,* 31 F.3d 615, 618 (8th Cir.1994) (citing *Erie* ); *Jackson v. Anchor Packing Co.,* 994 F.2d 1295, 1310 (8th Cir. 1993) (in a diversity action, the federal court is not free to fashion rules of law from whole cloth, but is instead bound to apply the law of the state in which it sits as far as it is able to discern it from the rulings of the state's courts). The court finds that protection of

**10.** Another circuit court of appeals has recently described the meaning of likelihood of success on the merits and its interplay with the balance of harms as follows:

What is true is that if the party seeking the preliminary injunction would suffer more harm from the denial of it than his opponent would suffer from its being granted, the injunction should be granted even if the party seeking it has no more than a 50–50 chance of winning, and even, in some cases, if the odds are worse. If for example the party seeking the injunction would lose $10,000 if it was denied, and has a 40 percent chance of being in the right, and the other party would lose only $1,000 if the injunction is granted and has (necessarily) a 60 percent chance of being in the right, then the cost of denial of the injunction to the party seeking it, when discounted by

the probability that he is in the right, would exceed the cost of granting the injunction to the other party, when discounted by the probability of his being in the right. (That is, $4,000 ($10,000 × .40) is greater than $600 ($1,000 × .60).). E.g., *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993); *Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988). But if as in this case the judge, having obtained in the preliminary hearing all the facts that [the judge] believes pertinent to deciding which party is in the right, is able to make up [his or her] mind that the party seeking the injunction has no legal ground for his case, [the judge] should not only deny the injunction, [he or she] should dismiss the suit; for [the judge] knows how it will come out. *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir.1994).

trade secrets is a matter of Iowa statutory and common law. *See 205 Corp. v. Brandow,* 517 N.W.2d 548, 551 (Iowa 1994) (holding that by omitting a section of the uniform act, which would have specifically displaced all other trade secret recoveries, at the time the act was adopted by the Iowa legislature, "Chapter 550 has not preempted all tort theories involving trade secrets," although duplicative recoveries would not be allowed; therefore, the court allowed claims of both misappropriation of trade secrets and inducement to breach a duty not to disclose confidential information); *see also Diversified Fastening Sys., Inc. v. Rogge,* 786 F.Supp. 1486, 1490–91 (N.D.Iowa 1991) (considering a statutory claim under Chapter 550 and a common-law breach of fiduciary duty not to disclose confidential information claim as alternative bases for granting a preliminary injunction to prevent disclosure of trade secrets).

*i. The Iowa Uniform Trade Secrets Act.*
The Iowa legislature passed the Iowa Uniform Trade Secrets Act, Iowa Code Ch. 550, in 1990, and amended that act in 1991. *See* Acts 1990 (73 G.A.) ch. 1201; Acts 1991 (74 G.A.) ch. 35; *see also Diversified Fastening Sys.,* 786 F.Supp. at 1491 (Iowa Code Chapter 550 was adopted in April of 1990). The Iowa Supreme Court recently discussed the essential features of the Trade Secrets Act in *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641 (Iowa 1995):

> Iowa Code section 550.3(1) (1991) provides that "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation." Iowa Code section 550.4(1) provides that "an owner of a trade secret is entitled to recover damages for the misappropriation."
>
> Iowa Code section 550.2(4) defines a trade secret as [follows:]

information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

> *a.* Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> *b.* Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

Iowa Code section 550.2(3) in pertinent part defines misappropriation as doing any of the following:

> *a.* Acqui[ring] a trade secret by a person who knows that the trade secret is acquired by improper means.
>
> *b.* Disclos[ing] or us[ing] a trade secret by a person who uses improper means to acquire the trade secret.
>
> *c.* Disclos[ing] or us[ing] a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.

Iowa Code § 550.2(3).

"Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1).

*Economy Roofing,* 538 N.W.2d at 646; *205 Corp. v. Brandow,* 517 N.W.2d 548, 550 (Iowa 1994) (Sections 550.4 and 550.5 provide for damages or injunctions misappropriation of trade secrets, respectively, and also quoting the statute's definition of trade secrets in 550.2(4)); [11] *see also Pioneer Hi–Bred Int'l v. Holden Foundation Seeds,* 35 F.3d 1226,

---

**11.** One of the 1991 amendments to the Trade Secrets Act substituted the word "both" in Iowa Code § 550.2(4) for "either," thus defining a "trade secret" as requiring both the limitations stated in subdivisions (a) and (b). Acts 1991 (74 G.A.) ch. 35, § 1, eff. April 23, 1991; *see also Brown v. Iowa Legislative Council,* 490 N.W.2d 551, 554 n. 2 (Iowa 1992) (noting the change from "either" to "both" in § 550.2(4), and con-

sidering a claim brought before the change under the former version of the statute, and finding that efforts to keep source codes encrypted and intervention in litigation to assert trade secrecy were sufficient to satisfy § 550.2(4)(b), and therefore finding the information at issue qualified under the statute as a trade secret, without suggesting that the information failed § 550.2(4)(a)).

1238 (8th Cir.1994) (finding that misappropriation of a trade secret under the common-law requires, *inter alia,* "improper means," but that improper means are not necessarily unlawful, and further finding that direct evidence of improper conduct is not required, and is rarely available; therefore, circumstantial evidence is sufficient, and an inference of misappropriation from limited facts is warranted, particularly where the secret is so unique its duplication would probably be improper); [12] *Diversified Fastening Sys., Inc.,* 786 F.Supp. at 1490–91 (identifying the essential elements of the Iowa act as later stated by the Iowa Supreme Court in *Economy Roofing* ).

■ An essential element of a claim, for an injunction or damages, under the Trade Secrets Act is whether the information in question could legally constitute "trade secrets," just as it was under the pre-existing common-law protection for trade secrets under Iowa law. *See Economy Roofing,* 538 N.W.2d at 646–47 (reversing district court's dismissal of trade secrets claim, because district court had erroneously concluded that the information in question "could never legally constitute trade secrets"); *205 Corp.,* 517 N.W.2d at 550–51 (also focusing on proper definition of "trade secret" to determine viability of claim under the act); *US West Communications, Inc., v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) (same); *and compare Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 245–46 (Iowa 1988) (common-law claim of misappropriation of a trade secret, brought before the Uniform Trade Secrets Act had been adopted in Iowa, identified the elements of such a claim as " '(1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret,' " quoting *Basic Chemicals, Inc. v. Benson,* 251 N.W.2d 220, 226 (Iowa 1977)); *and see also Pioneer Hi-Bred Int'l,* 35 F.3d at 1235 (finding that the elements of a common-law misappropriation

of trade secrets claim under Iowa law are those stated in *Basic Chemicals,* 251 N.W.2d at 226, and citing *Restatement of Torts,* § 757 cmt. b (1939), as embodying the definition of a trade secret; the court was not, however, faced with a challenge to the definition of a trade secret, but only considered whether the plaintiff had failed to keep the genetic messages for seed corn in question "secret," whether the defendant had actually possessed the protected genetic messages, and whether the defendant had obtained the material "by improper means."); *E.W. Bliss Co. v. Struthers–Dunn, Inc.,* 408 F.2d 1108, 1112 (8th Cir.1969) (stating elements of a common-law misappropriation of trade secrets claim identical to those stated in *Basic Chemicals*); *Diversified Fastening Sys.,* 786 F.Supp. at 1491 (considering injunction under the Iowa Trade Secrets Act, and stating, "The court does not decide whether th[e] common law action [available under Iowa law prior to enactment of the uniform act] has been supplanted by Iowa Code Chapter 550, or whether elements of the tort outlined by the Iowa courts are equally applicable to an action under Chapter 550," then citing the elements of the common-law claim of misappropriation of trade secrets under Iowa law as stated in *Kendall/Hunt Publishing* and *Basic Chemicals*). In a case decided shortly before *Economy Roofing,* the Iowa Supreme Court rejected any common-law definition of trade secrets as applicable under the trade secrets act, because the court found that "the words of the statute are plain and unambiguous." *205 Corp.,* 517 N.W.2d at 550; *and contrast Kendall/Hunt Publishing,* 424 N.W.2d at 246 (finding that an exact definition of a "trade secret" under the common law did not exist, and employing a multifactor test to determine whether information was or was not a trade secret). In *Economy Roofing,* the Iowa Supreme Court reaffirmed its broad interpretation of the definition of "trade secret" under Iowa Code § 550.2(4):

12. The Eighth Circuit Court of Appeals's decision in *Pioneer Hi–Bred Int'l,* in which federal jurisdiction was based on federal questions under the Lanham trademark act, but which also involved a complicated pendent claim, under Iowa law, asserting misappropriation of trade secrets, does not address the Iowa Trade Secrets Act or any

provision of Iowa Code Ch. 550. However, the *Pioneer Hi–Bred* litigation spanned many years, and was based on alleged misappropriation of trade secrets for corn seed that had occurred during the 1980s, prior to Iowa's passage of its trade secrets act. *See Pioneer Hi–Bred Int'l,* 35 F.3d at 1228–29.

In a recent case we gave a broad interpretation of "information" that could legally constitute "trade secrets":

> Under the plain language of [Iowa Code section 550.2(4) ] "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. Business information may also fall within the definition of a trade secret, including such matters as *maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures.* One commentator explains:
>
> > Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
>
> We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*US West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) (citations omitted).

*Economy Roofing,* 538 N.W.2d at 646–47 (emphasis in the original). The court, after reaffirming this broad interpretation of a "trade secret" under the act, noted that whether or not information in question constitutes a trade secret is "a mixed question of law and fact." *Id.* at 648. The "legal part of the question" is whether the information in question "could constitute a trade secret under the first part of the definition of trade secret in section 550.2(4) (" *'Trade secret'* means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process....")." *Id.* The "fact part of the question," on the other hand, arises from the remaining part of the statutory definition found in subdivisions (a) and (b) of § 550.2(4). *Id.* at 648–49. In other words, the factual question is whether the information is *both* of the following:

> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use[; and]
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4); *Economy Roofing,* 538 N.W.2d at 649.[13]

In *205 Corp.,* the Iowa Supreme Court further explained these two factual elements of a trade secret. *205 Corp.,* 517 N.W.2d at 550–51. The court noted that as to the first limitation, in § 550.2(4)(a), the plaintiff must "show it derived economic value because the [confidential pizza recipes] were unknown to, and not readily ascertainable by, a person who would profit from their disclosure and use." *205 Corp.,* 517 N.W.2d at 550; *US West,* 498 N.W.2d at 714 (§ 550.2(4)(a) requires proof of "independent economic value"). In referring to "economic value," the Iowa Supreme Court has held, this subsection of the statute "speaks to the value of the information to either the owner or a competitor; any information which protects the owner's competitive edge or advantage." *US West,* 498 N.W.2d at 714 (citing *Millgrim on Trade Secrets,* § 9.03(3)(f); *Stork–Werkspoor*

---

**13.** In *Economy Roofing,* the Iowa Supreme Court held that a court's determination that information is not, and presumably a determination that information is, a trade secret in the course of a preliminary injunction hearing is not a "final" determination on the merits of the question, but instead does not remove the issue from contention at a trial on the merits. *Economy Roofing,* 538 N.W.2d at 648. This, of course, is in keeping with the "general rule" this court has found applicable to preliminary injunction rulings under the law of the U.S. Supreme Court and this circuit. Furthermore, in the case before it in *Economy Roofing,* in which the district court had made only the legal part of the determination in the course of a preliminary injunction hearing, and the district court's determination on that part was clearly erroneous, the Iowa Supreme Court held that the court's refusal to reconsider the question at a summary judgment hearing was reversible error. *Id.* at 649.

*V.V. v. Koek*, 534 So.2d 983, 985 (La.Ct.App. 1988)). Thus, the court has held, "information kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." *Id.* (citing *Surgidev Corp. v. Eye Technology, Inc.*, 648 F.Supp. 661, 683 (D.Minn.1986), *aff'd*, 828 F.2d 452 (8th Cir.1987)).

However, "[b]eyond independent economic value, [the plaintiff] was required to show that it expended reasonable efforts under the circumstances to maintain secrecy of [its] [purported trade secrets]," citing Iowa Code § 550.2(4)(b) for this second limitation. *205 Corp.*, 517 N.W.2d at 550. This second element of a trade secret under the Iowa statutory definition is in keeping with the recognition of "secrecy" as one of the elements of the common-law definition of a trade secret. *See, e.g., Pioneer Hi–Bred Int'l*, 35 F.3d at 1235 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974), for the proposition that "[f]undamental to the existence of a trade secret is that the matter be, in fact, secret."); *Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1178–79 (8th Cir.1991) (same). In *205 Corp.*, the court concluded that the "key to this second element of the trade secret test is found in the words 'reasonable under the circumstances.'" *Id.* at 551 (in the case before it, the court found reasonable efforts under the circumstances even though all employees knew one of the recipes in question, because it was necessary for all employees to know it in order to maintain the freshness of the product by preparing it daily); *see also Pioneer Hi–Bred Int'l*, 35 F.3d at 1235 (common-law case holding, "The secrecy [of a purported trade secret], however, need not be absolute. Reasonable precautions to protect the secrecy of a trade secret will suffice," citing, *inter alia, Surgidev Corp. v. Eye Technology, Inc.*, 828 F.2d 452, 455 (8th Cir. 1987), and focusing, in that case, on "unanticipated," "undetectable," or "unpreventable" methods of espionage as exceeding what could reasonably be guarded against).

■ *ii. Is the information in question "trade secrets"?* The court concludes, at least provisionally, for the purposes of this preliminary injunction ruling, that Uncle B's Bakery's information identified, for example, in the Confidentiality Agreement, concerning its recipes, manufacturing, and packaging processes, is all "trade secrets" within the meaning of Iowa Code § 550.2(4). As to the legal part of the question, the court concludes that this information fits the statutory list of "trade secrets" as including, but not limited to, "a formula, pattern, compilation, program, device, method, technique, or process. . . ." *See* Iowa Code § 550.2(4); *Economy Roofing*, 538 N.W.2d at 648. As to the two companion factual tests of a "trade secret" under the Iowa act, the court finds, first, that Uncle B's Bakery has "show[n] it derived economic value because the [confidential recipes and processes] were unknown to, and not readily ascertainable by, a person who would profit from their disclosure and use." *205 Corp.*, 517 N.W.2d at 550 (§ 550.2(4)(a) is the source of this requirement); *see also Economy Roofing*, 538 N.W.2d at 648; *US West*, 498 N.W.2d at 714. Brooklyn Bagel Boys argues that almost all the individual segments of Uncle B's Bakery's production system were generally known to the baking industry, including MAP and some of the processes Uncle B's Bakery uses in raising its bagels, but, on the basis of the preliminary injunction record, the court concludes that the entirety of Uncle B's Bakery's manufacturing process, from ingredients through bagging, is sufficiently unique to constitute a trade secret under Iowa law. Furthermore, although it may be readily ascertainable that Uncle B's Bakery's bagels are packaged in an "air tight" bag, it is *not* readily ascertainable what equipment or process is involved in so bagging the bagels, nor is it readily ascertainable what part the formulation and preparation of the bagels themselves may have in their freshness without freezing and long shelf-life. Certainly, Uncle B's Bakery has "derived economic value" from its secret processes, because, as it asserts, it is the only bagel maker to produce "fresh, never-frozen" bagels for supermarket distribution, giving it a unique share of the grocery store bagel market. This value of the information would accrue to "either the owner or a competitor [and is] information which protects the owner's competitive edge or advantage." *US*

*West,* 498 N.W.2d at 714. Indeed, Brooklyn Bagel Boys' assertion that it had found the MAP process impracticably expensive suggests that a bagel production system that is founded on the process, at least one beginning to enjoy significant commercial success, may have some unique qualities that could cause a reevaluation of the practicability of MAP for the bagel industry and therefore constitute a process of independent economic value to competitors.

■ Not only does the information concerning recipes, production, and packaging processes pass the "independent economic value" prong of the "trade secret" test under § 550.2(4)(a), but it also passes the "reasonable efforts under the circumstances to maintain secrecy" prong of the test stated in Iowa Code § 550.2(4)(b). *205 Corp.,* 517 N.W.2d at 550; *see also Economy Roofing,* 538 N.W.2d at 648 (§ 550.2(4)(b) provides the second factual inquiry of the trade secrets test). The court finds that Uncle B's Bakery's requirement that all visitors to its plant, including prospective employees, sign a Confidentiality Agreement, like that signed by O'Rourke, constitutes a "reasonable" effort under the circumstances to maintain the secrecy of its recipes, manufacturing, and packaging processes. Thus, the information concerning recipes, manufacturing, and packaging processes that Uncle B's Bakery seeks to protect from disclosure here by way of a preliminary injunction is indeed "trade secrets" entitled to that protection. Thus, Uncle B's Bakery has shown a reasonable likelihood of success on its trade secrets claim to the extent that the information it seeks to protect is trade secrets under governing law.[14] *Cf. United Centrifugal Pumps v. Cusimano,* 708 F.Supp. 1038, 1042–43 (W.D.Ark.1988) (where the court simply could not tell if the information in question was trade secrets, even though the court did not need to determine with certainty that the movant had a better than fifty percent chance of succeeding on the merits of its trade secrets claim, the court found no sufficient likelihood of success on the merits to issue a preliminary injunction on disclosure or employment with a competitor).

■ *iii. Is there a likelihood of disclosure by "improper means"?* Governing law, in the form of the Iowa Trade Secrets Act, also provides a legal basis for Uncle B's Bakery's claim that its "trade secrets" have been "misappropriated," because, pursuant to § 550.2(3), O'Rourke's disclosure of, and Brooklyn Bagel Boys' acquisition of these "trade secrets" would be through "improper means." *See* Iowa Code § 550.2(3)(a)–(c). "Improper means" include "breach of a duty to maintain secrecy." Iowa Code § 550.2(a); *Economy Roofing,* 538 N.W.2d at 646. Here, Uncle B's Bakery has shown, to the extent necessary to demonstrate a reasonable likelihood of success on the merits of its claim, that O'Rourke was subject to such a duty not to disclose information Uncle B's Bakery considered trade secrets or otherwise confidential. That duty arises, in the first instance, from the Confidentiality Agreement O'Rourke signed on December 14, 1993. Any breach of that duty would occur if O'Rourke were to disclose confidential information to Brooklyn Bagel Boys through his employment, and therefore any disclosure to Brooklyn Bagel Boys or any acquisition of that information by Brooklyn Bagel Boys from O'Rourke would be via "improper means" in violation of the statute. As shall be discussed further in the next subsection, however, the Confidentiality Agreement is not the only source of such a duty the breach of which would be "improper."

14. That is not to say that all of the information Uncle B's Bakery claimed was trade secrets at the preliminary injunction hearing fits the definition. The court rejects a "trade secrets" designation for information concerning identity of brokers, for example, because Uncle B's Bakery failed to demonstrate that this information is not readily ascertainable upon inquiry in the industry. The court has found three specific categories of information to be trade secrets, recipes, manufacturing, and packaging processes, and no more information need be specifically identified as trade secrets in order to demonstrate likelihood of success on the merits. Thus, although there is "not limited to" language in Uncle B's Bakery's Confidentiality Agreement, the court limits the scope of its provisional finding of "trade secrets" here to the categories of information specifically identified in the Confidentiality Agreement and in the "Non–Disclosure/Non–Compete" Agreement.

 *iv. Likelihood of a successful common-law claim.* As a further matter, the Iowa Supreme Court in *Economy Roofing* considered the question of whether, irrespective of whether the information in question constituted a "trade secret" within the meaning of the statute, the plaintiff should have been allowed to offer evidence that the defendants had breached a fiduciary duty to maintain the secrecy of the information considered confidential by their former employer. *Economy Roofing,* 538 N.W.2d at 648. The court read its prior fiduciary duty cases to encompass not only a fiduciary duty of an employee to an employer, but, more specifically, a fiduciary duty of an employee "to maintain the secrecy of the information [the former employer] *described* as trade secrets." *Id.* (emphasis added). The court found that "misappropriation" of trade secrets under the Trade Secrets Act, § 550.2(3) and § 550.2(1), included disclosure when the person making the disclosure had acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use, or had breached a duty to maintain secrecy, and also found that the defendants were employees subject to a fiduciary duty to their employer. *Id.* For both of these reasons, the court concluded that the plaintiff former employer should have been allowed "to present evidence on whether (1) the information in the computer constituted trade secrets under the statutory definition of trade secrets, and (2) [the former employee defendants] had a fiduciary duty to maintain the secrecy of this information." *Id.* at 648.[15] The court in *Economy Roofing* cited with approval the conclusion of the federal district court in *Norand Corp. v. Parkin,* 785 F.Supp. 1353 (N.D.Iowa 1990), in which the court, applying Iowa law, had found the likely existence of a fiduciary duty not to disclose trade secrets and confidential information in part by looking at the definition of "misappropriation" in § 550.2(3)(b), and therefore enjoined a former employee from accepting a position with a competitor. *Norand Corp.,* 785 F.Supp. at 1355; *see also Diversified*

*Fastening Sys., Inc.,* 786 F.Supp. at 1491 (taking note of a plaintiff employer's assertion that there is an Iowa common-law fiduciary duty to maintain the secrecy of trade secrets and confidential business information, but finding that all of the information in question was probably trade secrets, and therefore there was sufficient likelihood of success on a statutory or common-law claim of misappropriation of trade secrets). This court reads these cases, at least for the purposes of ruling on the preliminary injunction motion, as standing for the proposition that disclosure of information the employer desires to keep confidential, and makes reasonable efforts to maintain as confidential, even if the information is not technically "trade secrets" under the statutory definition, may be enjoined as a violation of the common-law fiduciary duty of a former employee to a former employer. *See 205 Corp.,* 517 N.W.2d at 551 (holding that "Chapter 550 has not preempted all tort theories involving trade secrets"). Because the court finds, for the purposes of its preliminary injunction ruling, that O'Rourke was an employee subject to this fiduciary duty, and was certainly aware that Uncle B's Bakery valued the secrecy or confidentiality of the information in question irrespective of whether the information was technically "trade secrets" under the Iowa act, the court concludes that Uncle B's Bakery has also shown a reasonable likelihood of success under governing law on its claim that the information in question should not be disclosed, even if it is not trade secrets. The practical effect of this conclusion is to bring within the scope of any preliminary injunction not only the information provisionally held to be "trade secrets" above, but such other information as Uncle B's Bakery asserted in the preliminary injunction hearing was "confidential."

 *v. Substantial defenses.* The court therefore turns to the question of whether Uncle B's Bakery's likelihood of success has been undermined by an adequate showing of an affirmative defense by the

---

**15.** The court also held that although employees may take with them general knowledge acquired during their employment, an allegation that the employees took with them information surreptitiously copied or stolen and provided it to a competitor should have survived a motion for summary judgment. *Id.*

defendants. The essence of the court's conclusions above is that Uncle B's Bakery has not failed to state a "trade secrets" claim, so that defendants' first affirmative defense does not substantially undermine Uncle B's Bakery's likelihood of success on the merits of its "trade secrets" claims. As to the defendants' third affirmative defense, that O'Rourke never signed any restrictive covenant with Uncle B's Bakery, the court has found, at least for the purposes of this preliminary injunction ruling, that O'Rourke did indeed sign the Confidentiality Agreement, which is such a restrictive covenant. Thus, only the second of defendants' affirmative defenses, that Uncle B's Bakery first breached the employment contract with O'Rourke, requires further discussion.

Defendants' assertion that Uncle B's Bakery first breached any employment contract by failing to honor the vacation pay and moving expenses provisions of the January 10, 1994, letter agreement bears no necessary connection to any duty O'Rourke had not to disclose information Uncle B's Bakery regarded as "secret" or confidential. First, that duty upon O'Rourke arises from the common law fiduciary duty of an employee to an employer, *Economy Roofing*, 538 N.W.2d at 648, not from any employment contract. Second, the Confidentiality Agreement, which embodies an agreement not to disclose confidential information, pertained not to O'Rourke's status as an employee, but to his status as a "visitor" to Uncle B's Bakery's production facility, and, by its terms, pertained to any and all future visits to the plant. Confidentiality Agreement, p. 2, ¶ 3. Thus, the second affirmative defense does not undermine Uncle B's Bakery's likelihood of success on its "trade secrets" claims.

■■■ Defendants' second affirmative defense at least hints at a further ground for finding Uncle B's Bakery has only a limited likelihood of success on the merits: the Confidentiality Agreement might be unenforceable. In *Diversified Fastening Systems*, a federal decision from this district applying Iowa trade secrets law to a motion for a preliminary injunction to prevent disclosure of purported trade secrets, the court, first concluded that the information in question

had been shown to be trade secrets, to the degree necessary to demonstrate probability of success on the merits. *Diversified Fastening Sys.*, 786 F.Supp. at 1491. The court then considered whether the plaintiff former employer's likelihood of success had been undermined by an assertion of the unenforceability of the non-disclosure and non-competition agreements upon which the employer in part founded its right to enjoin a former employee's disclosure of trade secrets to his new employer, a competitor. *Id.* at 1491–95; *accord Curtis 1000*, 878 F.Supp. at 1257–63 (considering whether a non-competition clause upon which a motion for a preliminary injunction was based was valid and enforceable as part of the determination of the plaintiff's likelihood of success). In both *Diversified Fastening Systems* and *Curtis 1000*, the court found that the Iowa Supreme Court applies a three-prong test to the enforceability of any restrictive covenant:

(1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest?

*Curtis 1000*, 878 F.Supp. at 1260 (citing, inter alia, *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986), and *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983)); *Diversified Fastening Sys.*, 786 F.Supp. at 1493 (same). Although the court concludes, to the extent it would make such a conclusion in ruling on a motion for a preliminary injunction, that the Confidentiality Agreement complies with these three tests, the court also concludes that in this case, at least as to misappropriation and disclosure of trade secrets, the Iowa Trade Secrets Act and common law provide all the legal basis necessary for a preliminary injunction to enjoin such disclosures and misappropriations. Therefore, whether or not the Confidentiality Agreement is unenforceable would not undermine Uncle B's Bakery's likelihood of success on a claim of misappropriation and disclosure of trade secrets under governing law. *See, e.g., Baker Elec. Co-op*, 28 F.3d at 1473–74 (likelihood of success on the merits requires that the movant find support for its position in governing law).

Thus, Uncle B's Bakery's likelihood of success on its misappropriation of trade secrets claims is sufficient to weigh in favor of the preliminary injunction it seeks.

### b. Non-competition

In *Diversified Fastening Systems,* then-District Court Judge David Hansen also noted that "Iowa Code Chapter 550 and the common law protection for trade secrets applies only to prevent the disclosure of trade secrets. It does not apply to prevent competition with an employer, except to the extent that that competition utilizes trade secrets." *Diversified Fastening Sys.,* 786 F.Supp. at 1491. Contrary to Brooklyn Bagel Boys' assertions, the court finds, at least provisionally, that Brooklyn Bagel Boys is a competitor of Uncle B's Bakery, because both make and distribute grocery store bagels and, furthermore, among the products of both companies are bread aisle bagels. That issue provisionally resolved, the question remains whether Uncle B's Bakery can show a likelihood of success on the merits of its claim to enjoin O'Rourke's employment with a competitor, Brooklyn Bagel Boys.

▆▆▆▆▆▆ When there is a non-competition agreement between the parties, in order to determine a likelihood of success on the merits of enforcing such a clause under governing law, the court must consider, as it did in *Curtis 1000,* whether the non-competition is valid and enforceable under Iowa law. *See Curtis 1000,* 878 F.Supp. at 1257–64, 1268–72; *accord Vencor, Inc. v. Webb,* 33 F.3d 840, 845 (7th Cir.1994) (where non-competition clause was unenforceable as unreasonable under Kentucky law, movant for preliminary injunction to enforce non-competition failed to show likelihood of success on the merits); *Baxter Int'l, Inc. v. Morris,* 976 F.2d 1189, 1197 (8th Cir.1992) (Illinois law, applicable under Missouri choice of law rules, requires that court consider enforceability of cove-

nants not to compete in light of their reasonableness); *Millard v. Electronic Cable Specialists,* 790 F.Supp. 857, 862 (D.Minn.1992) (likelihood of success on claim to enforce non-competition agreement, for purposes of a preliminary injunction, required the court to consider factors of validity and enforceability under Minnesota law). In this prior decision, the court concluded that non-competition covenants are generally valid and enforceable under Iowa law, and that, applying the same analytical questions for the enforceability of a restrictive covenant stated above, concluded that the covenant not to compete in question was enforceable. *Id.* The court, applying this analysis to the covenant not to compete proffered here, also finds it valid and enforceable, as a general matter.[16]

More specifically, the first prong of the test, whether or not the restriction is reasonably necessary for the protection of the employer's business, *Curtis 1000,* 878 F.Supp. at 1260, has been met, because Uncle B's Bakery has made an adequate showing for preliminary injunction purposes that O'Rourke, in his position as plant manager, "pirated or had the chance to pirate part of plaintiff's business." *Id.* (quoting *Iowa Glass Depot,* 338 N.W.2d at 381). Because of O'Rourke's involvement in the company management team meetings, in which he testified the "unusual" customers or sales targets were discussed, even if the whole sales picture was not discussed, O'Rourke had the chance to identify these "unusual" customers for Brooklyn Bagel Boys as customers for Brooklyn Bagel Boys' products as alternatives to Uncle B's Bakery's. More convincingly still, on the preliminary injunction record, O'Rourke " 'received from his employer "special training or peculiar knowledge that would allow him to unjustly enrich himself at the expense of his former employer." ' " *Id.* at 1261 (quoting *Dain Bosworth, Inc. v.*

---

**16.** At the preliminary injunction hearing, the court expressed its personal disagreement with the rule that continued employment can serve as adequate consideration for a non-competition agreement. However, as the court recognized both in the hearing and in its decision in *Curtis 1000,* the Iowa Supreme Court is of a different view. *See Curtis 1000,* 878 F.Supp. at 1259–60. The court must here apply Iowa law, not seek to

alter it by judicial fiat or personal preference. Adequate consideration for the non-competition agreement, if O'Rourke signed it upon arrival to work, therefore exists in O'Rourke's continued employment with Uncle B's Bakery, even if Uncle B's Bakery demanded agreement to such a covenant without any prior notice that it was a job requirement, or any prior discussion of its terms.

*Brandhorst,* 356 N.W.2d 590, 593 (Iowa Ct. App.1984), in turn quoting *Iowa Glass Depot,* 338 N.W.2d at 382); *accord Millard,* 790 F.Supp. at 862–63 (non-competition clause was reasonably necessary to protect former employer's development of services and products with which the former employee had been closely associated). That information, in this case, is the trade secrets the court has concluded have independent economic value, and to which O'Rourke was not only privy, but instrumental in their development. As to the second prong of the test, unreasonable restrictiveness to the employee, *id.* at 1260, the court notes that a five-year time period is at the very limits of what the Iowa courts have found enforceable. *See Id.* at 1262 (citing, *inter alia, The Phone Connection, Inc. v. Harbst,* 494 N.W.2d 445, 449–50 (Iowa Ct.App.1992)). However, in light of Uncle B's Bakery's relative youth and significant investment in development of its unique processes, the court does not find the five-year restriction to be unreasonably restrictive, at least for the purposes of a preliminary injunction, which, if entered, would last for a significantly shorter time period than that. Finally, the court can find no public interest undermining the non-competition clause in this case.

 However, the question here is not so much whether the "Non–Disclosure/Non–Compete" Agreement is *enforceable* by its terms, but whether O'Rourke ever *agreed* to be bound by its terms. Thus, the court must return to the question of the adequacy of the evidence presented as demonstrating that O'Rourke signed the "Non–Disclosure/Non–Compete" Agreement, even though no signed copy of the agreement has

been produced. The court considered above the standards for determining likelihood of success on the merits, and noted, *inter alia,* that the question is not whether the court predicts that the movant for a preliminary injunction will succeed, but whether the movant's success on the merits is "at least … sufficiently likely to support the kind of relief it requests." *Sanborn Mfg.,* 997 F.2d at 488 (the court found sufficient likelihood of success where the court concluded that either result argued by the opposing parties was directly supported by the evidence presented). Here, the court has identified as a critical credibility determination that must ultimately be made by the trier of fact whether O'Rourke signed the non-competition agreement. Plainly, a jury or trier of fact could go either way on the question, and therefore Uncle B's Bakery's success is "at least … sufficiently likely to support the kind of relief it requests." *Id.* Furthermore, there is evidence to push the determination beyond equipoise, as this is not merely a case in which the contradictory testimony of two witnesses must be weighed. Rather, there is substantial evidence that everyone at Uncle B's Bakery was aware of and signed "Non–Disclosure/Non–Compete" Agreements, down to the lowest level employees. The court has difficulty believing that the one person a company would most like to see bound by such an agreement, its plant manager, was simply overlooked, although admittedly it is not beyond the realm of possibility. The court therefore finds a reasonable likelihood that Uncle B's Bakery will succeed in showing that O'Rourke signed and is bound by the terms of the "Non–Disclosure/Non–Compete" Agreement.[17]

17. Because the court finds that Uncle B's Bakery has a reasonable likelihood of success on the merits of a claim that O'Rourke agreed to be bound by the "Non–Disclosure/Non–Compete" Agreement, the court need not here consider the further question of whether an injunction on O'Rourke's continued employment with Brooklyn Bagel Boys could be based solely on a need to protect trade secrets or confidential information. *Diversified Fastening Sys.,* 786 F.Supp. at 1491. The court recognizes that as a general matter, courts will enjoin employment with a competitor in order to protect a former employer from disclosure of trade secrets where disclosure appears inevitable from the nature of the former

employee's employment with the competitor. *See, e.g., Norand,* 785 F.Supp. at 1355 ("It does concern the court that there is no non-competition agreement between plaintiff and defendant," but the court found that simply prohibiting nondisclosure would be insufficient as the defendant could not help but use his knowledge in his employment with a competitor company, citing as supporting such a conclusion *Emery Indus., Inc. v. Cottier,* 202 U.S.P.Q. (BNA) 829 (S.D.Ohio 1978), and *Air Prods. and Chem., Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982)). Although defendants' counsel particularly directed the court's attention to the decision in *Emery Industries* as indicating critical reasons, not pres-

Because the court concludes that Uncle B's Bakery has shown a reasonable likelihood of success under governing law on its "trade secrets" and "non-competition" claims, the court next addresses the question of whether Uncle B's Bakery can also show the threat of irreparable harm if defendants are not enjoined from disclosing or misappropriating trade secrets or O'Rourke's continued employment with Brooklyn Bagel Boys is not enjoined.

### 2. Irreparable harm

 Despite the requirement that the court consider all of the factors in the *Dataphase* analysis, in this circuit "a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op*, 28 F.3d at 1472 (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir.1989) (*en banc*), and *Dataphase*), and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir.1992) (citing *Modern Computer*, 871 F.2d at 738). To put it another way, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge*, 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987)). Thus, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." [*Gelco*, 811 F.2d] at 420. *Accord Modern Computer Sys.*, 871 F.2d at 738; *Dataphase*, 640 F.2d at 114 n. 9. We must inquire, then, whether [movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.* Sufficient showing on this second factor in the *Dataphase* analysis can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op*, 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a prelimi-

nary injunction will not issue. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir.1992) (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors).

 Here, the Confidentiality Agreement specifically states that the parties agree that any violation of its terms "will cause Company immediate and irreparable harm which money damages cannot adequately remedy." Confidentiality Agreement, p. 2, ¶ 2; *accord Overholt Crop Ins. Serv. Co.*, 941 F.2d at 1371 (holding that "[i]rreparable harm 'can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.'"); *Curtis 1000*, 878 F.Supp. at 1273 (citing *Overholt*); *Millard*, 790 F.Supp. at 860 ("Courts infer irreparable harm upon the breach of a non-competition covenant where confidential information is involved."). The court has found, at least provisionally, that O'Rourke agreed to be bound by the terms of this agreement, and therefore concludes that, at least as to its "trade secrets" claims, Uncle B's Bakery has adequately demonstrated a threat of irreparable harm, because there is a threat of a breach of the agreement implicit in O'Rourke's employment with a competitor. Similarly, the court finds that there is comparable language in the "Non–Disclosure/Non–Compete" Agreement, and the court has also found that Uncle B's Bakery has shown a reasonable likelihood that this agreement is binding on O'Rourke. However, the court will still consider defendants' argument that there is little real threat of disclosure of trade secrets in the course of O'Rourke's employment, such that he should not also be enjoined from employment with Brooklyn Bagel Boys.

 Defendants have argued, and presented supporting testimony to the effect that, O'Rourke has not and will not disclose trade secrets to Brooklyn Bagel Boys, that Brooklyn Bagel Boys has never requested any such disclosure, and has in fact request-

ent here, for enjoining continued employment when no non-competition agreement is involved, the court need not discuss that decision where it

has found a reasonable likelihood that the defendant *is* bound by a non-competition agreement.

ed that O'Rourke *not* divulge any of Uncle B's Bakery's trade secrets or confidential information. Defendants' arguments and evidence are also to the effect that Brooklyn Bagel Boys has no desire or need for Uncle B's Bakery's trade secrets, because they are satisfied with their own recipes and manufacturing and packaging methods, thank you very much. Defendants also presented substantial evidence that Brooklyn Bagel Boys' current manufacturing and packaging methods are so different from Uncle B's Bakery's that it is unlikely that O'Rourke will necessarily disclose Uncle B's Bakery's confidential information or trade secrets in the course of his employment with Brooklyn Bagel Boys. Defendants also argue, far less persuasively, that even if they contemplated using or appropriating "air tight" packaging processes, Uncle B's Bakery would enjoy for a considerable time its current monopoly on such processes, because of the necessity of obtaining and implementing the required equipment and processes. The court is not inclined to split hairs about how long it might take Brooklyn Bagel Boys to appropriate the technology and processes required, when the real question is whether there is an imminent threat of *disclosure* of the necessary technology and processes, which is the irreparable harm, even if the economic harm actually comes later in the form of application of the improperly disclosed information. Certainly, if the disclosure allows a competitor to cut corners in the research and development process of a similar packaging process, the competitor will attain a competing product that much sooner, and it is this harm to Uncle B's Bakery that is irreparable.

The court finds that there is sufficient threat of irreparable harm in this case to weigh in favor of enjoining both disclosure of trade secrets and O'Rourke's employment with Brooklyn Bagel Boys. As to the former, the harm from disclosures, the Confidentiality Agreement embodies the parties' agreement that a threat of irreparable harm exists if any confidential information is disclosed, and the court, having found, at least provisionally, that the information in question is indeed trade secrets, of independent economic value to Uncle B's Bakery or a competitor, also recognizes that disclosure of

such information threatens irreparable harm. As to the latter, harm of continued employment, the court notes that there is significant danger of an inadvertent disclosure by O'Rourke of Uncle B's Bakery's confidential information in the course of his employment with Brooklyn Bagel Boys. Although an employee is entitled to use the fund of general knowledge he or she has accumulated in the course of employment, that entitlement does not extend to use of trade secrets. Where the one kind of knowledge ends and the other begins is sufficiently uncertain in this case to raise a realistic threat of inadvertent disclosure of trade secrets, and consequently a threat of irreparable harm to Uncle B's Bakery, from O'Rourke's continued employment with Brooklyn Bagel Boys. Furthermore, the court finds it highly unlikely that O'Rourke would not draw upon processes or solutions employed by Uncle B's Bakery should comparable problems arise either in Brooklyn Bagel Boys' present production system, or in the course of Brooklyn Bagel Boys' independent development and implementation of a MAP bagging system or processes for producing never frozen refrigerator bagels, should it eventually find that it does want to enter that sector of the market after all. *Accord PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995) (affirming district court's determination, under the Illinois version of the Uniform Trade Secrets Act, that employment with a competitor should be enjoined, because "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [the new employer's products] by relying on his knowledge of [his former employer's] trade secrets."); *Baxter Int'l, Inc. v. Morris,* 976 F.2d 1189, 1194 (8th Cir.1992) (after trial on the merits, the district court granted, but limited the scope of, a permanent injunction enjoining disclosure of trade secrets where it was "far from clear" that the new employer would seek to develop products similar to the former employer's or that the new employer could use the former employer's technology for its current purposes). In *Redmond,* the Seventh Circuit Court of Appeals also stated,

It is not the "general skills and knowledge acquired during his tenure with" [the former employer] that [the former employer] seeks to keep from falling into [the new employer's] hands, but rather "the particularized plans or processes developed by [the former employer] and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors."

*Redmond*, 54 F.3d at 1269. The court therefore concluded that the former employer had done much more than assert that skilled employees were taking their skills elsewhere, and a preliminary injunction enjoining the former employee's continued employment with a competitor was therefore appropriate. *Id.* The same situation obtains here. O'Rourke would be taking with him far more than his skills, but particularized plans or processed developed by Uncle B's Bakery, in which development O'Rourke was intimately involved. Although Brooklyn Bagel Boys purportedly has no current plans to enter the refrigerated, never frozen sector of the grocery store bagel market, and suggested that it could not use Uncle B's Bakery's processes or technology for its current purposes, Brooklyn Bagel Boys' representative indicated circumstances in which it would reevaluate its product lines and develop a product along Uncle B's Bakery's lines. Thus, it is clear, at least on the preliminary injunction record, that Uncle B's Bakery has reason to fear that Brooklyn Bagel Boys will be motivated to appropriate its technology and processes, and the threat of disclosure of those processes and that technology poses a threat of irreparable harm. *Compare Baxter Int'l, Inc.*, 976 F.2d at 1194 (although it was "far from clear" that there was interest in or the possibility of transfer of technology, limited permanent injunction against disclosure of trade secrets was properly entered). Thus, the court concludes that the "irreparable harm" factor also weighs in favor of the issuance of a preliminary injunction in this case.

### 3. Balance Of Harm

■ The court notes that the analysis of the next *Dataphase* factor, "the balance be-

tween the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest," *Pottgen*, 40 F.3d at 929, is not identical to the "irreparable harm" analysis. Irreparable harm focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. In contrast, the balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. *Id.; see also Glenwood Bridge*, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); *Modern Computer Sys.*, 871 F.2d at 737–38 (harm to other interested parties also considered).

■ In conducting the balance of harm analysis required under *Dataphase*, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall*, 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to the each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op*, 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn*, 997 F.2d at 489. Where the nonmovant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir.1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the nonmovant of granting a pre-

liminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a *preliminary* injunction." *Id.* at 490 (emphasis in the original).

■ As to the balance of harms from enjoining disclosure of trade secrets or confidential information, the court finds that the balance once again tips in favor of a preliminary injunction. As the court has observed, Uncle B's Bakery stands to suffer significant injury, economic and non-economic, if disclosure of its trade secrets is not enjoined. However, defendants' evidence and arguments that there has been and will be no disclosure of trade secrets suggests that they will suffer no harm if the court enjoins what they have already voluntarily done. Controlling precedent of the Eighth Circuit Court of Appeals appears to point the other direction, however, because the appellate court has held that a consideration in the balance of harm calculus is whether the defendants have already voluntarily taken remedial action, and where the nonmovants have taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Sanborn,* 997 F.2d at 489. In this case, the court concluded above that notwithstanding defendants' evidence of their remedial measures, there was still a threat of harm from an inadvertent disclosure, and the court concludes therefore that the threat of harm to Uncle B's Bakery has not been eliminated. Thus, the balance of harms still weighs in favor of issuance of an injunction against disclosure of trade secrets.

The balance of harms is more complicated as to enjoining O'Rourke's continued employment with Brooklyn Bagel Boys. In *Curtis 1000,* the court found that, despite an employee's right to work, the balance of harms weighed in the former employer's favor to enjoin an employee from violating a non-competition clause. *Curtis 1000,* 878 F.Supp. at 1274. That conclusion was based on the existence of a non-competition clause, the fact that the validity of the non-competition clause under applicable Delaware law encompassed a balancing of the economic harms to both parties to the agreement, and an observation that the employee would not be pre-

cluded from working with his present employer, but only from competing with his former employer for certain customers. *Id.* at 1274. In the case now before the court, however, the court has also found an adequate showing of a non-competition agreement, but the court has not yet balanced the economic harms to the parties of barring O'Rourke's employment with Brooklyn Bagel Boys. Furthermore, an injunction would entirely deprive O'Rourke of his current employment.

The court is hesitant to enter an injunction barring a person from continuing that person's employment, but concludes that the balance of harms nonetheless, if only slightly, actually tips in favor of an injunction on O'Rourke's continued employment with Brooklyn Bagel Boys. The court, once again, has concluded that Uncle B's Bakery is faced with a significant threat of disclosure of its trade secrets, including inadvertent disclosure. The body of secret or confidential information from Uncle B's Bakery known to O'Rourke covers every aspect of Uncle B's Bakery's operations, and is far more extensive than the body of "secret" information known to the defendant employees enjoined from employment with competitors in any decision of the Iowa Supreme Court of which this court is aware. *See Curtis 1000,* 878 F.Supp. at 1260–62 (citing Iowa cases in which the critical information known to the departing employee giving rise to a reasonable need for a covenant not to compete was customer lists and goodwill). Also balanced against O'Rourke's loss of his job is the fact that the bagel-making industry is not the only one in which O'Rourke has considerable work experience and ability, thus an injunction on employment with a competitor does not leave O'Rourke without employment prospects. *Accord Millard,* 790 F.Supp. at 863 (court found little hardship likely to result from enjoining employee not to compete where employee had "demonstrated abilities" and experience in fields in his industry that did not compete with his former employer). Furthermore, O'Rourke's employment with Brooklyn Bagel Boys has been so short-lived at this point that it is doubtful he has established himself as a "key man" without whom Brooklyn Bagel Boys

cannot continue to function. The court is not unmindful of the harms O'Rourke may suffer if he loses his current employment, but the court has every reason to believe that those harms will be short-lived, may be eased by reasonable assistance of his current employer who is not blameless in the loss of his current employment, and involves harms that should have been foreseen by the defendants when they contemplated hiring a manager away from a competitor, knowing that competitor employed unique manufacturing and packaging processes.

### 4. The Public Interest

The final factor in the *Dataphase* analysis is the impact of granting or denying the preliminary injunction upon the public interest. *Pottgen,* 40 F.3d at 929. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious.[18] Here, however, the court finds the public interest embodied and articulated in the Iowa legislature's passage of the Iowa Trade Secrets Act. Thus, the court finds that the public interest in protection of trade secrets weighs in favor of an injunction to accomplish that end. *Accord Heather K.,* 887 F.Supp. at 1266–67 (finding the public interest more than adequately stated in legislation to accomplish the ends also sought by the proposed injunction). Further, an injunction to enforce a contractual agreement, even a contractual agreement not to compete for some period of time, is not repugnant to the public interest, as recognized by Iowa law on enforceability of such agreements. *Curtis 1000,* 878 F.Supp. at 1257–58; *accord Millard,* 790 F.Supp. at 863 (valid non-competition clauses do not violate public policy).

All relevant factors therefore tip, to one degree or another, in favor of granting a preliminary injunction in this case enjoining both disclosure of trade secrets and continued employment that threatens such disclosure.

### C. The Requirements Of Fed.R.Civ.P. 65(c) & (d)

#### 1. The scope of a preliminary injunction

Pursuant to Federal Rule of Civil Procedure 65(d), which requires, *inter alia,* that "every order granting an injunction and every restraining order ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...," the preliminary injunction in this case must specifically sets forth its terms. The court finds that an injunction of proper scope can be fashioned from appropriate language in the Confidentiality Agreement, to which O'Rourke definitely agreed, and from the "Non–Disclosure/Non–Compete" Agreement, to which, although it is disputed, Uncle B's Bakery has shown a reasonable likelihood O'Rourke agreed.[19]

In order to ease somewhat the harm O'Rourke will suffer as the result of an injunction on his present employment, the court will stay that portion of the preliminary injunction pertaining to O'Rourke's continued employment for a period of thirty days, in order that O'Rourke may make other employment arrangements. **The court warns the defendants that any disclosure by O'Rourke or any acquisition by Brooklyn Bagel Boys of Uncle B's Bakery's trade secrets or confidential information, either during this thirty-day grace period or af-**

18. The "public interest" factor involves, among other things, the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op,* 28 F.3d at 1474 (citing *James River Flood Control Ass'n v. Watt,* 680 F.2d 543, 544–45 (8th Cir.1982) (*per curiam* )); *James River Flood Control Ass'n,* 680 F.2d at 544–45 (public interest served by avoiding "greater expenditures from the public treasury"). The public interest also favors enjoining false statements, and enjoining the safety risks arising from false labeling of products. *Sanborn Mfg.,* 997 F.2d at 490.

19. The court is mindful of the venerable decision of the Eighth Circuit Court of Appeals in *E.W. Bliss Co.,* 408 F.2d at 1113–17, in which the appellate court systematically found each provision of the injunction against former employees' disclosure and competition invalid as overbroad. However, the court concludes that the present injunction, fashioned as indicated, would survive such scrutiny, in light of the need to protect Uncle B's Bakery from intentional and inadvertent disclosure of its trade secrets and confidential information.

terwards, during the pendency of the preliminary injunction, will be punished as contempts by the severest sanctions of which this court can avail itself.

### 2. *Fed.R.Civ.P. 65(c)'s security requirement*

■ Interesting questions arise as to *Fed.R.Civ.P.* 65(c)'s security requirement in this case. In *Curtis 1000*, after extensive consideration of the decisions of courts concerning whether or not some security is always required before issuance of a preliminary injunction, and the mandatory language of *Fed.R.Civ.P.* 65(c), which states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant," this court concluded "requiring a bond in some amount before issuing a preliminary injunction is far the better course." *Curtis 1000*, 878 F.Supp. at 1279.

The only reason application of that conclusion might be called into question in this case is that the Confidentiality Agreement specifically states that the party to be enjoined agrees to issuance of a preliminary injunction "without bond." Confidentiality Agreement, p. 2, ¶ 2. However, the other agreement upon which a prayer for injunctive relief is founded, the "Non–Disclosure/Non–Compete" Agreement, does not contain any "without bond" language in its injunction provisions. "Non–Disclosure/Non–Compete" Agreement, p. 2, ¶ 4. Uncle B's Bakery's prayers for relief in its complaint mirror this situation, praying as to Count I, the "trade secrets" claim based on violation of the Confidentiality Agreement, for a preliminary and permanent injunction to issue without bond, but making no reference to the bond require-

ment as to the other counts on which injunctive relief is sought.

■ In this case, the court believes that even if it were enjoining misappropriation of trade secrets and O'Rourke's employment with a competitor solely on the basis of the Confidentiality Agreement, even in the face of the "without bond" language in that agreement, "far the better course" would still be to require a bond in some amount. Certainly, where, as here, the injunction on employment with a competitor is directly based on the "Non–Disclosure/Non–Compete" Agreement, which contains no "without bond" language, the court concludes that a bond in some amount is required. There are very sound policy reasons for the bond requirement, identified in *Curtis 1000*. *Curtis 1000*, 878 F.Supp. at 1275–79. First, the defendant who has been wrongfully enjoined has no recourse for damages in the absence of a bond. *Curtis 1000*, 878 F.Supp. at 1277–78 (citing *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2186 n. 14, 76 L.Ed.2d 298 (1983)). Second, because a preliminary injunction proceeding is both expedited, resulting in only provisional findings of fact, and interlocutory, there is a higher chance that the district court will err in granting the preliminary injunction. *Id.* at 1278 (citing *inter alia*, *Clark v. K–Mart*, 979 F.2d 965, 968 (3d Cir.1992)). In this case, where the preliminary injunction will deprive O'Rourke of his present employment and deprive Brooklyn Bagel Boys of its present manager, both requirements likely to impose some real economic burdens on the defendants, even if those burdens are outweighed, as the court concluded, by Uncle B's Bakery's potential harm, both of the policy reasons for the bond requirement ring true.[20] Furthermore, the rule stating the

---

20. These policy reasons would be just as applicable were the present injunction on employment with a competitor based only on the ground that such an injunction was the only practical means of enforcing the Confidentiality Agreement. If the only barrier to a preliminary injunction to protect fully its *trade secrets* were a requirement that Uncle B's Bakery provide sufficient security to protect defendants from the obvious consequences of wrongly enjoining O'Rourke's employment with Brooklyn Bagel Boys, and if the risk of harm to Uncle B's Bakery is as dire as that risk has been portrayed to the court, the court thinks it likely that Uncle B's Bakery would

accept without hesitation the condition of posting a bond in this case. The alternative for Uncle B's Bakery would be the possibility that an appellate court would deem that imposition of a preliminary injunction without a bond was improper, and Uncle B's Bakery would thereby lose the protection it claims it so desperately needs. Perhaps recognizing these realities, Uncle B's Bakery did not assert that the preliminary injunction should issue without bond even when asserting the Confidentiality Agreement alone was adequate to require enjoining O'Rourke's

bond requirement is couched in mandatory terms. *Fed.R.Civ.P.* 65(c). At the preliminary injunction hearing, Uncle B's Bakery did not press any contention that a preliminary injunction in this case, whatever its basis, should issue without bond. For all of these reasons, the posting of a bond in some amount will be required before the preliminary injunction in this case will issue.

█ Although there may be some split in authority as to whether or not imposition of any bond is mandatory, there is no split in authority that the amount of any bond actually imposed remains a matter of the court's discretion. *See Curtis 1000,* 878 F.Supp. at 1279–80 (citing cases so holding, and identifying some factors to guide the court's discretion). Of some help is the statement of the Eighth Circuit Court of Appeals that security should be imposed "in an amount that fairly protects the [defendants] should it be ultimately found that the [defendants] [have] been wrongfully enjoined." *Glenwood Bridge, Inc.,* 940 F.2d at 373. With this and such other factors as equity suggests in mind, the court turns to consideration of the proper amount of the bond to be required in this case.

First, the court finds that an adequate security would cover O'Rourke's potential loss of salary and benefits during the pendency of the preliminary injunction, less any salary and benefits he can reasonably be expected to earn from alternative employment. O'Rourke testified that his present annual salary, exclusive of benefits, is $80,000, and his previous annual salary with Uncle B's Bakery was $65,000. Second, the court finds that an adequate security would cover Brooklyn Bagel Boys' inconvenience in seeking an interim or permanent replacement for O'Rourke. The court therefore considers that, with a reasonable expectation of completion of this litigation within the next two years, and a reasonable expectation that O'Rourke will find alternative employment at some point during that period, probably sooner rather than later, a reasonable bond would be in the amount of $100,000.

The court will therefore issue a preliminary injunction with the scope and bond requirement stated above.

## III. CONCLUSION

█ The court's application of the *Dataphase* factors in this case leads it to the conclusion that a preliminary injunction must issue enjoining disclosure of Uncle B's Bakery's trade secrets by O'Rourke, misappropriation of those secrets by Brooklyn Bagel Boys, and O'Rourke's continued employment with Brooklyn Bagel Boys. The court finds that some, at least, of the information at issue is indeed trade secrets, and that Brooklyn Bagel Boys is indeed a competitor of Uncle B's Bakery to whom disclosure of its secrets would be detrimental to Uncle B's Bakery. Uncle B's Bakery has demonstrated a reasonable likelihood of success on its claims of misappropriation of trade secrets under Iowa statutory and common law that is sufficient basis for a preliminary injunction. Although finding that Uncle B's Bakery's ultimate success on its claim of violation of a covenant not to compete may be a very close question, coming down to the trier of fact's weighing of credibility of the conflicting accounts of the signing or non-signing of the non-competition agreement, the court nonetheless concludes that Uncle B's Bakery's success on the merits of a claim that O'Rourke is bound by a non-competition agreement is at least sufficiently likely to support the kind of relief it requests. In light of the economic value of the trade secrets in question to Uncle B's Bakery or a competitor, the court concludes that Uncle B's Bakery has also demonstrated a threat of irreparable harm, and that the balance of this harm to Uncle B's Bakery outweighs the harm to O'Rourke of loss of employment and to Brooklyn Bagel Boys of losing its present plant manager. The court finds that there is a public interest in protection of trade secrets articulated in the Iowa Trade Secrets Act and that this public interest will be vindicated by a preliminary injunction to prevent disclosure of trade secrets. The court therefore concludes that a preliminary injunction

continued employment with Brooklyn Bagel Boys or any other competitor.

of appropriate scope should issue after the posting of adequate security.

Uncle B's Bakery's motion for a preliminary injunction is therefore **granted.**

**IT IS SO ORDERED.**

### PRELIMINARY INJUNCTION

**WHEREAS,** pursuant to *Fed.R.Civ.P.* 65(b), the court finds that there is a threat of disclosure of trade secrets and confidential information of plaintiff Uncle B's Bakery, Inc., and an actual or threatened violation of a non-competition agreement between Uncle B's Bakery and defendant Kevin O'Rourke, each of which poses a threat of irreparable harm to plaintiff Uncle B's Bakery, Inc., and whereas, in light of all of the circumstances known to the court and upon a balance of the equities, the court concludes that a preliminary injunction should issue, defendants **Kevin O'Rourke** and **Brooklyn Bagel Boys, Inc.,** are **hereby enjoined** as follows:

1. **Defendant Kevin O'Rourke** is **hereby enjoined** from disclosing any and all of Uncle B's Bakery's past, present, or future raw or processed products, ingredients, formulas, original and unique recipes, manufacturing, advertising or design techniques, plans, ideas, equipment brands and types, processes, methods, and operating conditions, including packaging techniques or processes, not previously publicly known, and such other information as Uncle B's Bakery has sought to maintain as confidential during Mr. O'Rourke's employment with Uncle B's Bakery. **Defendant Brooklyn Bagel Boys** is **hereby enjoined** from appropriating or obtaining or seeking to appropriate or obtain any of the above-listed information from Kevin O'Rourke, or utilizing in any way such information previously obtained from Kevin O'Rourke.

2. **Defendant Kevin O'Rourke** is **hereby enjoined** from competing directly or indirectly, or having an interest in any business, corporation or other entity which competes directly or indirectly, or working for any person, business, corporation or other entity which competes directly or indirectly with Uncle B's Bakery, including defendant Brooklyn Bagel Boys, within a 500 mile radi-

us of any of Uncle B's Bakery's marketing outlets during the pendency of this preliminary injunction. This paragraph of this preliminary injunction is stayed for the period of thirty days from the date of this order, in order to allow Kevin O'Rourke a reasonable opportunity to obtain alternative employment, although during that thirty-day period, the defendants shall remain subject to all other terms of this preliminary injunction.

3. This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order.

4. This preliminary injunction shall issue upon the giving of security of One Hundred Thousand Dollars ($100,000) by applicant Uncle B's Bakery.

5. This preliminary injunction shall remain in full force and effect until further order of this court.

**IT IS SO ORDERED.**